**STATE of Oklahoma ex rel. OKLAHOMA BAR ASSOCIATION, Complainant,**

v.

**Lewis M. WATSON, Respondent.**

**SCBD No. 3842.**

Supreme Court of Oklahoma.

March 22, 1994.

Rehearing Denied March 24, 1995.

John E. Douglas, Asst. Gen. Counsel, Oklahoma Bar Ass'n, Oklahoma City, for complainant.

John B. Axton, Ada, for respondent.

LAVENDER, Vice Chief Justice.

We are asked to determine whether Respondent has violated various provisions of the Code of Professional Responsibility for conduct arising from representation and litigation occurring in 1979–1981, and if so, determine the appropriate measure of discipline. Upon a review of the entire record we find that Respondent violated DR 1–102(A)(4), DR 2–107(A), DR 5–106(A), DR 5–107(A)(1), and DR 9–102(A) and DR 9–102(B)(3) of the Code of Professional Responsibility, 5 O.S.1981, Ch. 1, App. 3.[1]

## FACTS OF MISCONDUCT

Lewis M. Watson (Respondent) represented three parties in a wrongful death and personal injury action. He never met with the three parties all together. The action and subsequent claims against Respondent arose from an automobile accident in September 1979, where David Walker (Walker) was killed. Walker's wife, Lela Walker, now Wakely (Wakely) was injured in the accident and hospitalized. Walker's brother, Philip Walker (Philip) requested Respondent, a family acquaintance, to represent Walker's dependents in claims arising from the accident.

Respondent entered into a written contingency fee contract with Wakely and a similar contract with Walker's seven year old daughter, Angela, through Celia Reynolds (Reynolds), Angela's mother and Walker's first

---

1. In that Complainant's evidence did not clearly prove Respondent's unfitness to practice law or that Respondent's actions impaired the interest of any of his clients, we find no violation of DR 1–102(A)(6) or DR 5–105(A), (B), (C), or (D).

wife, as next friend and guardian. The two contracts each provided that Respondent was to receive a percentage of the "moneys recovered" from 25% graduating up to 50% depending on the extent of the litigation; 50% fee in the event an appeal was taken. The contracts did not state whether the percentage was gross or net based. Respondent represented Philip, who became the personal representative of Walker's estate, although there was no written contract.

In the spring of 1981 the jury returned a verdict for Wakely for $45,030.05 and $3,149.151 for the Estate of Walker. There was no award made for Angela. Respondent filed for and was granted a new trial for Wakely and Angela from which the defendant appealed. Respondent however, had also learned that the defendant was uninsured and allegedly was hiding property that would be used to satisfy a judgment and thereafter brought an action for fraudulent conveyance against the defendant. During discovery defendant offered to settle all claims for $68,000. Respondent consulted Walker's father regarding the offer, but did not consult Wakely, his client. Respondent accepted the offer and the defendant dismissed his appeal.

Respondent determined the division of the award without consulting his clients. Wakely received $52,159.80 which was based on her original verdict of $45,030.05 plus interest. The Estate of Walker got $3,306.60 which represented the original award of $3,149.15 plus interest. Angela got the remaining $12,533.60. Respondent prepared no documents to present to his clients in accounting for the award, who got what, how it was allocated in paying expenses, or how attorney fees were computed. The Professional Responsibility Tribunal (PRT) concluded that Respondent did not tell Wakely that Angela received a settlement. Only Reynolds was asked to sign the court order and judgment that set out the division of the award.

In September 1981 Respondent settled with Wakely in his office, i.e., distributed settlement proceeds to her and paid her medical expenses resulting from the 1979 accident. At that time Wakely signed a Settlement Agreement (Wakely's Settlement) which now shows she received a total of $21,000 out of the $52,159.80 awarded to her. The evidence presented to the PRT shows that Wakely's Settlement had been altered and that $21,000 was hand written over the figure that previously read "$11,500". Wakely's medical expenses totaled $1,578.05. Wakely's Settlement provides she would pay all expenses of the action, but makes no mention of paying the other parties' attorney fees. The $21,000 was paid to Wakely by two checks written by Respondent. One check was for $11,500 which Wakely left with and deposited into her own bank account. The other check was for $9,500 which bears Wakely's endorsement on the back and was deposited by Respondent in his Real Estate Account.

According to the finding of the PRT, Wakely thought she was setting up a trust fund for Angela by using part of her own award. Wakely stated she did this, because she was under the impression that Angela received no award. Wakely testified she felt badly for Angela and wanted to share. Wakely discussed this with Respondent and left his office thinking she had provided money from her award for a trust fund for Angela. Wakely understood that after Respondent took half of her award in attorney fees and paid all medical and litigation expenses out of Wakely's half and gave Wakely $11,500, there would be enough to establish a trust fund for Angela. The $9,500 Wakely signed back to Respondent is not mentioned in Wakely's Settlement.

The Settlement Agreement Respondent prepared for Angela and Reynolds (Angela's Settlement) states that Respondent waived attorney fees in representing Angela. Although Wakely's Settlement states Wakely will bear all expenses, Respondent took $1,033.60 from Angela's $12,533.60 award for expenses. Respondent gave $1,000 to Reynolds for Angela's benefit, and with the remaining $10,500, Respondent bought a CD and set up a trust fund for Angela in which he acted as guardian until Angela reached

the age of eighteen.[2]

Respondent testified Wakely knowingly paid Angela's attorney fee. Respondent never told Wakely he had waived his attorney fee in Angela's Settlement, but according to Respondent's own testimony he stated he did inform Wakely that because she was so generous in wanting to provide Angela some of her award by paying Angela's attorney fees, he would lower Angela's attorney fee so Wakely would be paying less.

None of the $68,000 was ever deposited in Respondent's client account, but only into his operating account (and real estate account) from which he made disbursements. Respondent received $36,535.45 in attorney fees, which is $2,535.45 in excess of a 50% fee based on the gross award.

In 1989 Wakely called Respondent to inquire regarding the trust fund she thought she had provided Angela. Respondent informed her he could not divulge confidential information because she was not a guardian, and there was no such fund. Wakely contacted Reynolds and learned for the first time Angela had received an award. Reynolds learned Wakely had provided part of her settlement for Angela's benefit.

Wakely contacted the Oklahoma Bar Association (Complainant) who investigated and filed a complaint. The PRT found that Respondent was uncooperative at first and furnished inaccurate and misleading information during the investigation. The investigation discovered that Respondent had counted a $1,000 expense twice in determining litigation expenses and had charged a $1,500 bonus made to his secretary to the expenses de-ducted from Wakely. Respondent testified that the former was an accounting error and that the latter charge was made inadvertently.

## STANDARD OF REVIEW

■ This Court has original and exclusive jurisdiction in all matters involving discipline for persons licensed to practice law in Oklahoma.[3] The findings and recommendations of the PRT are given great weight, but are advisory and not binding because our determinations on bar disciplinary matters are *de novo* and are the ultimate authority.[4] This Court may approve and adopt the findings of the PRT or make our own findings and take whatever action we deem appropriate.[5] The charges against the Respondent must be established by clear and convincing evidence.[6]

## STATUTE OF LIMITATIONS

■ Respondent suggests that the five year statute of limitation period provided in civil proceedings pursuant to 12 O.S.1991 § 95 is applicable in this case and should have barred the proceedings of the PRT and should bar the enforcement of the PRT's report in that the events in question occurred in 1981 which was eight years before Wakely requested the OBA investigate the matter. Complainant points to *State ex rel. Oklahoma Bar Ass'n v. Warzyn*[7] where we said in a bar disciplinary matter that "this Court deems it inappropriate that an arbitrary statute of limitations on alleged attorney miscon-

---

2. Respondent, as guardian of Angela's trust fund, drew from the fund on a few occasions at the request of Reynolds to pay for expenses for Angela, but Respondent did not obtain court permission to make the withdrawals pursuant to 12 O.S.1981 § 83:

   Until the person becomes eighteen (18) years of age, withdrawals of monies from such account or accounts shall be solely pursuant to order of the court made in the case in which recovery was had.

   *Cf.* 12 O.S.1991 § 83 ( & Supp.1993).

   Respondent took a trustee fee out of the trust fund each year for his management thereof.

3. Rule 1.1, Rules Governing Disciplinary Proceedings, 5 O.S.1991 Ch. 1, App. 1–A. (& Supp.

1993); *State ex rel. Oklahoma Bar Ass'n. v. Todd*, 833 P.2d 260 (Okla.1992).

4. *State ex rel. Oklahoma Bar Ass'n v. Flanery*, 863 P.2d 1146 (Okla.1993); *Todd*, 833 P.2d 260; *State ex rel. Oklahoma Bar Ass'n v. McMillian*, 770 P.2d 892 (Okla.1989).

5. Rule 6.15(a), Rules Governing Disciplinary Proceedings, 5 O.S.1991 Ch. 1, App. 1–A.

6. Rule 6.12(c), Rules Governing Disciplinary Proceedings, 5 O.S.1991, Ch. 1, App. 1–A; *Flanery*, 863 P.2d at 1147–48.

7. 624 P.2d 1068 (Okla.1981).

duct be imposed."[8] Accordingly, we find that the proceeding of the PRT regarding Respondent's misconduct was not barred by a statute of limitations, nor is our consideration of the matter barred.

## MISREPRESENTATION

Respondent is charged with violating DR 1-102(A)(4) by engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation.[9] In 1981 Respondent misled and or allowed Wakely to think she was providing money for Angela either for a trust fund, as Wakely testified, or for attorney fees, as Respondent testified, based on Wakely's belief that Angela received no recovery. Whether Respondent concealed that fact from Wakely or failed to clearly explain it and allowed her to believe what she did, the result was misrepresentation. Wakely did not learn the truth of Angela's recovery until 1989. There is no documentary evidence showing Respondent informed Wakely of the final distribution of the $68,000 award to the three parties. Wakely was operating under the belief that Angela received no award given the jury verdict.

Respondent argues that the award and its distribution is a matter of public record and Wakely had constructive notice of it. Under these circumstances constructive notice is not enough. Wakely hired Respondent to represent her, i.e., there was an attorney-client relationship. Wakely testified she trusted Respondent. Respondent had the duty to advise Wakely on all legal matters regarding this matter. We note that Respondent secured Reynolds' signature on the final judgment and award, and that Wakely testified she never saw in writing the final distribution, never signed such a document or was aware such a document existed.

Respondent contends he had no intention of misleading Wakely, believes that he explained everything to her, and that Wakely was confused in her testimony and memory regarding the settlement particulars. Even if true, this explanation is inconsistent with and does not account for Respondent's overcharging of attorney fees, charging his secretary's bonus to the litigation expenses, charging one expense twice, inflating Angela's legal fee collected from Wakely, allowing Wakely to be misinformed about Angela's award, and not informing Reynolds that Wakely had paid Angela's legal fees. Angela's Settlement states that Respondent waived his attorney fee, "attorney waives any attorney fee," in representing her. The reason he did is irrelevant. The fact is Respondent represented to Reynolds there was no fee for Angela, while Respondent represented to Wakely there was a fee and collected an increased fee from Wakely for his representing Angela.[10]

Our review of the evidence sustains a finding that Respondent was guilty of misrepre-

---

8. We noted in *Warzyn* that Article 9, Section 9, of the Rules Creating and Controlling the Oklahoma Bar Association stated:

    The fact that certain acts or unprofessional conduct may at times have remained unchallenged shall not impair the jurisdiction of this Court nor excuse a wrongdoer. 5 O.S.1971, Ch. 1, App. 1.

    Complainant correctly points out that Art. 9 was revoked effective July 1, 1981, when we adopted the Rules Governing Disciplinary Proceedings. These rules provide for no statute of limitations in disciplinary proceedings. While Article 9 no longer exists, the section 9 provision content remains good policy, especially in the instant case where Respondent's alleged misconduct was only detected years after it occurred, and then brought to the attention of the Oklahoma Bar Association soon after.

9. Code of Professional Responsibility, 5 O.S. 1981, Ch. 1, App. 3, DR 1-102(A):

    A lawyer shall not:

    (4) Engage in conduct involving dishonesty, fraud, deceit, or misrepresentation.

    This rule is now found in Rule 8.4(c) of the Rules of Professional Conduct, 5 O.S.1991, Ch. 1, App. 3-A, which supersede the Code. The Code of Professional Responsibility will be used throughout our determination of any misconduct by Respondent since the Code was in force during the time of the events that gave rise to the claim.

10. Respondent testified that the $9,500 check Wakely endorsed back to him was to cover Angela's attorney fees. Without determining here the proper percentage of the fee taken from the award, based on Angela's $12,533.60 recovery, the maximum Respondent, at 50% gross based fee, could claim would be $6,266.80. Yet Respondent charged Wakely $9,500 for legal services to Angela. The excessive nature of the fee will be discussed further herein.

sentation both to Wakely and Reynolds. His actions constituted a violation of DR 1–102(A)(4).

## CHARGING EXCESSIVE FEES

Respondent is accused with violating DR 2–107(A) by charging and collecting a clearly excessive fee.[11] Respondent's contingency fee agreements with Wakely and Angela provided for a 40% attorney fee if the case went to trial, and 50% if an appeal was taken. The evidence shows that Respondent did not take an appeal nor did he have to file documents in response to the defendant's initiating an appeal, yet Respondent took over 50% of the $68,000 award. According to the terms of his own contracts, Respondent violated DR 2–107(A) in taking $36,535.45, a clearly excessive fee.

Respondent accepted a $9,500 attorney fee from Wakely for the attorney fees of Angela after he had waived that fee in Angela's Settlement. The PRT concluded Respondent waived that fee and we agree. Respondent included the statement "attorney waives any attorney fee" in Angela's Settlement. If he had intended to collect those fees from another party, he should have stated that Angela's fees were to be collected from Wakely upon the former's consent.

Respondent maintains that Wakely offered to give all her award to benefit Angela, but that Respondent suggested Wakely just pay Angela's fee and then Respondent would not deduct any fee from Angela's award. However, Wakely testified she was unaware that Angela received an award until her discovery in 1989. Whether she knew or not does not explain why Respondent charged Wakely more for Angela's fees than he would have charged Angela, and it does not explain Respondent's lack of disclosure to Reynolds pursuant to DR 5–107, i.e., that Wakely was paying Angela's fees. Since the only legitimate conclusion is that Respondent waived all of Angela's attorney fee, $9,500 should be deducted from Respondent's collection from Wakely.

In any event, Respondent's charge to Wakely of $9,500 for Angela's fees was inflated. If Respondent had not waived his fees to Angela, then based on her award of $12,533.60 the most he could have recovered, based on a 50% fee, would have been $6,266.80. However, as we have already stated this amount would have been excessive because Respondent did not take an appeal.[12]

Respondent contends that because of his efforts in pursuing the fraudulent conveyance action he should be paid fees on a quantum merit basis in addition to the contingency contract arrangement, because his efforts resulted in a larger award for his clients. Therefore, Respondent argues, there was no excessive fee. Respondent's appraisal of the situation is flawed.

First, the fraudulent conveyance action was a *necessary* measure, according to Respondent's own words in his deposition of May 14, 1990, to ensure that the defendant would pay the judgment for the original action. Second, although the fraudulent conveyance action was a separate filing, it was part and parcel to and derivative from the initial wrongful death and personal injury action. The result of Respondent's aggressive measure was the receipt of the larger

---

11. Code of Professional Responsibility, 5 O.S. 1981, Ch. 1, App. 3, DR 2–107 (Supp 1983):
    (A) A lawyer shall not enter into an agreement for, charge, or collect an illegal or clearly excessive fee.
    (B) A fee is clearly excessive when, after a review of the facts, a lawyer of ordinary prudence would be left with a definite and firm conviction that the fee is in excess of a reasonable fee.
    This provision was renumbered in 1983 from DR 2–106(A) and (B) to DR 2–107(A) and (B). This provision is now covered by Rule 1.5(a) (lawyer's fee shall be reasonable, based on several listed factors) and Rule 1.8(j)(2) (reasonable contingent fee) of the Rules of Professional Conduct, 5 O.S. 1991, Ch. 1, App. 3–A.

12. Respondent testified that the $9,500 figure for Angela's fees was based on a "hoped for" $25,000 award for Angela, therefore allowing Respondent to collect $12,500 based on a 50% collection rate. Because Angela received only $12,533.60 in settlement, Respondent stated he reduced his fee for her to $9,500. The problem with this thinking is obvious. *There was never a $25,000 award for Angela, except in Respondent's mind.* An attorney cannot base his contingency fee on an award amount that does not exist.

amount of $68,000 offered by the defendant and accepted by Respondent for his clients.

The original jury verdict had been for a total of $48,179.20. With the increased award, each party received more in either interest or award, and since the pot was increased, Respondent's percentage-take equalled more actual dollars, i.e., 40% or 50% of $68,000 is more than 40% or 50% of $48,-179.20. Therefore, Respondent in actuality did receive more money because of his fraudulent conveyance efforts and those efforts were compensated within the confines of Respondent's contingency contracts. Further, Respondent did not have a contract with any of his clients for any non-contingent fees nor did he request more fees, provide an itemized accounting for more fees, or negotiate to modify the existing contracts for additional fees. Not until the OBA's investigation of the claims against Respondent began did Respondent articulate the theory of quantum merit for fees for the fraudulent conveyance action efforts to explain the excessive fees collected from his clients.

The PRT found that Respondent took a 50% attorney fee off the top of the awards to his clients, i.e., Respondent took gross based fees as opposed to net based fees. Respondent took his fee first, then paid all litigation expenses from his clients' portion of their awards. Respondent's contracts with Wakely and Angela do not state whether Respondent's percentage is gross or net based, but do state that all expenses directly incurred by Respondent would be borne and paid by the clients. Complainant argues and the PRT agrees that Respondent's fee should have been net-based and not gross-based pursuant to 5 O.S.1981, § 7 which states:

It shall be lawful for an attorney to contract for a percentage or portion of the proceeds of a client's cause of action or claim *not to exceed* fifty percent (50%) of the *net* amount of such judgment as may be recovered.... (Emphasis added).[13]

Respondent counters with the argument that this Court has the inherent power to organize, regulate, and control the Bar and that the Code of Professional Responsibility and Disciplinary Rules would supersede and in effect repeal 5 O.S. § 7. Also, the Code allowed for reasonable contingency fees and did not specifically limit fees to a net recovery.

Complainant argues that the Legislature has the power to regulate the making of contracts. Also, the Code was adopted subsequent to 5 O.S. § 7 so that the use and meaning of "reasonable fee" and "clearly excessive" without explanation in the Code contemplated the limitation established by 5 O.S. § 7.[14] Complainant is persuasive.[15] Respondent should have based his fee on his clients' net recovery (after litigation expenses were paid) rather, than on the gross recovery (before expenses were paid). For all of the reasons stated, we find that Respondent by charging clearly excessive fees violated DR 2–107(A) as defined by DR 2–107(B).

## SETTLING SIMILAR CLAIMS OF CLIENTS

In considering the entire record we find Respondent's lack of disclosure resulted in

13. The 1991 version of this statute is identical to the 1981 version of the stated clause, with the exception that the 1991 version uses the term "per centum" which was the original term used when the statute was enacted, whereas the 1981 version uses "percent".

14. *See Schaff v. Richardson,* 120 Okla. 70, 254 P. 496 (1926) (in regarding costs and expenses; the rights of the attorney and client in contingency fee arrangement must be determined by the "net amount" recovered.); *State ex rel. Oklahoma Bar Ass'n v. Hatcher,* 452 P.2d 150, 153 (Okla.1969).

15. Compare Rule 1.5(c) of the Rules of Professional Conduct, 5 O.S.1991, Ch. 1, App. 3–A:
A contingent fee agreement shall be in writing and shall state the method by which the fee is to be determined, including the percentage or percentages that shall accrue ... and other expenses to be deducted from the recovery, *and whether such expenses are to be deducted before or after the contingent fee is calculated.* (Emphasis added).
Without commenting on this provision we note that the Rules became effective in 1988 and do not govern the action of the case at hand, which occurred in 1981. This disciplinary action is governed by the Code of Professional Responsibility. The Code had no such provision.
Also compare Rule 1.5, Comment, Terms of Payment:
Applicable law may impose limitations on contingent fees, such as a ceiling on the percentage.

violation of DR 5–106(A). Respondent represented multiple clients and made an aggregate settlement without obtaining each client's consent or advising each client as to the proposed settlement and distribution.[16] Respondent did not consult with all of his clients before accepting the defendant's $68,-000 settlement offer. Wakely, specifically, was not contacted by Respondent prior to his acceptance of the offer. Evidence shows Wakely was never informed by Respondent and was unaware of the final total award, its distribution, and the participation of each client in the settlement and did not learn of Angela's award until 1989.

Respondent argues that under 12 O.S.1981 § 1053 the proper party plaintiff in wrongful death actions is the personal representative of the deceased who shall recover on behalf of the estate, surviving spouse, children, etc.[17] Respondent claims Philip, as the true plaintiff, was the only client Respondent had to inform and consult regarding the settlement, and that Philip, as personal representative, was the one and only true client for the action. However, Respondent admits he was unaware of this statute at the time of the litigation and was not operating under it, but he contends that the result of the action and settlement distribution method shows compliance. This reasoning does not excuse the violation of the Code provision. Respondent cannot in hindsight gloss over the fact that he entered into contracts with Wakely and Angela, in explaining and excusing why he did not consult with them regarding the settlement offer or in advising them of each other's distribution. Likewise, Respondent cannot dispense with the personal injury interest of Wakely. We find that Respondent had three clients in the action and owed to each the right of disclosure and consent in accepting and distributing the award.

## ACCEPTING COMPENSATION FROM ONE OTHER THAN ONE'S CLIENT

In violation of DR 5–107(A)(1), Respondent accepted compensation for his legal services from one other than his client without full disclosure or consent.[18] The PRT found that while Respondent made a technical violation of the literal provisions of this rule, that violation did not seem to be conduct violating the intent and spirit of DR 5–107. This provision speaks of accepting compensation from one other than one's client. Respondent received compensation for Angela's legal fees from Wakely. Although both were his clients for the purpose of the action, Respondent made separate contracts with each and according to the contracts' terms intended to collect from each a separate fee. Respondent waived his fees as to Angela in Angela's Settlement, and without disclosing to Reynolds and without obtaining her consent turned around and collected his fees from Wakely, who was not a client under his contract with Angela. Because of Respondent's lack of disclosure and lack of obtaining Reynolds' consent, this activity allowed Respondent to overcharge Wakely for Angela's fees and hid the fact that Angela's fees were not in actuality waived, because Wakely paid them. Respondent's lack of disclosure and lack of obtaining consent allowed Reynolds to believe for eight years that Respondent did

---

**16.** Code of Professional Responsibility, 5 O.S. 1981, Ch. 1, App. 3, DR 5–106:

(A) A lawyer who represents two or more clients shall not make or participate in the making of an aggregate settlement of the claims of or against his clients, unless each client has consented to the settlement after being advised of the existence and nature of all the claims involved in the proposed settlement, of the total amount of the settlement, and of the participation of each person in the settlement.

This provision is now found in Rule 1.8(g) of the Rules of Professional Conduct, 5 O.S.1991, Ch. 1, App. 3–A.

**17.** When the death of one is caused by the wrongful act or omission of another, the personal representative of the former may maintain an action therefor against the latter.... 12 O.S.1981, § 1053.

**18.** Code of Professional Responsibility, 5 O.S. 1981, Ch. 1, App. 3, DR 5–107:

(A) Except with the consent of his client after full disclosure, a lawyer shall not:

(1) Accept compensation for his legal services from one other than his client.

This rule is now found in Rule 1.8(f) of the Rules of Professional Conduct, 5 O.S.1991, Ch. 1, App. 3–A.

not charge or receive fees for representing Angela.[19]

We think Respondent fully violated this provision. Respondent's actions show the danger in lack of disclosure to clients regarding fees. Lack of disclosure might permit, as it did in the case at hand, an attorney to unfairly manipulate his charges and collection of fees. At the very least this type of activity lends itself to an appearance of impropriety. We think full disclosure and consent is the best policy regarding compensation for legal services as well as all dealings in attorney-client relations, and because Respondent failed at both, we find he violated this important provision.

## FAILURE TO PRESERVE IDENTITY OF FUNDS MAINTAINING AND RENDERING ACCOUNTS

According to DR 9–102(A) a lawyer must deposit all client funds paid to him, other than advances for costs and expenses, in an identifiable bank account.[20] The evidence shows that although Respondent kept a client trust account, he deposited all three settlement checks from the defendant's attorneys to Respondent and his three clients, Wakely, Angela, and Philip (Walker Estate) into his lawyer operating account. The PRT found that Respondent technically violated this provision by commingling client funds with Respondent's funds, although evidence shows the commingling caused no harm to any client. We agree with that assessment. Respondent actually paid his clients with his own funds for the amount stipulated by the settlement agreements he made with them prior to his depositing the three settlement checks from the defendant into his operating account.

For example, Respondent obtained Wakely's endorsement on the check for $52,159.80 made out to her and Respondent, wrote personal checks to her for her part of the settlement minus his fee(s), then deposited the $52,159.80 check into his own account. Seemingly the client's funds were unscathed by this activity, even though, as we have stated, we believe Respondent left Wakely with too little in his settlement with her. While clients here were unharmed by the banking methods used, we stress the importance of maintaining clients' funds and attorneys' funds separately in compliance with the Code of Professional Responsibility (now Rules of Professional Conduct) and to avoid the appearance of impropriety.

We are more concerned under these facts with the violation of DR 9–102(B)(3) which states:

(B) A lawyer shall:

(3) Maintain complete records of all funds ... coming into the possession of the lawyer and render appropriate accounts to his client regarding them.[21]

As previously noted, Respondent did not disclose or provide an accounting to his clients of the aggregate funds received, attorney's fee charged to each, or expenses allocated to each client's portion of the settlement. Further, Wakely requested an accounting when she contacted Respondent in 1989. Respondent did not fulfill that request and has not repaid her any money overcharged.

## MEASURE OF DISCIPLINE

To protect the interests of the public, the legal profession, and the courts is the pri-

**19.** Respondent testified that he did not disclose to Reynolds the fact that Wakely was paying Angela's legal fees because Wakely had asked him not to reveal that information. If this is true it still does not preclude the violation of DR 5–107 which makes full disclosure with consent mandatory before a lawyer may accept compensation from another.

**20.** Code of Professional Responsibility, 5 O.S. 1981, Ch. 1, App. 3, DR. 9–102:
(A) All funds of clients paid to a lawyer or law firm, other than advances for costs and

expenses, shall be deposited in one or more identifiable bank accounts maintained in the state in which the law office is situated and no funds belonging to the lawyer or law firm shall be deposited there....
This provision is now found in Rule 1.15 of the Rules of Professional Conduct, 5 O.S.1991, Ch. 1, App. 3–A.

**21.** Code of Professional Responsibility, 5 O.S. 1981, Ch. 1, App. 3, DR 9–102(B)(3), now found in Rule 1.15(b) of the Rules of Professional Conduct, 5 O.S.1991, Ch. 1, App. 3–A.

mary purpose of disciplinary action.[22] We said in *State ex rel. Oklahoma Bar Association v. McMillian*[23] that "[a]nother purpose is to deter the respondent from similar future conduct and to act as a restraining vehicle on others...."

In arriving at the appropriate level of discipline, we may consider mitigating evidence.[24] Respondent's testimony shows and the PRT found that Respondent still maintains he committed no misconduct, but operated properly in representing and settling with his clients. The PRT found Respondent shows no remorse. Respondent offered testimony from those involved in the Walker action that he did an outstanding job as an advocate and represented the clients well in the action in recovering the $68,000. No one disputes this and that is not at issue. What is at issue is Respondent's conduct and lack of disclosure in representing multiple clients, distributing the award, and misrepresenting the facts concerning its distribution and attorney fees based on it. Respondent also presented testimony noting his forty plus years of law practice without any other disciplinary claims against him, his good reputation, competence, and standing in the local legal community.

Complainant urged this Court to impose a suspension of two years and one day, and restitution to his former client. The Trial Panel recommended a six months suspension and restitution. The Trial Panel considered as mitigation to the serious nature of the violations and Respondent's lack of remorse, Respondent's forty plus years of practice without previous allegations of misconduct and testimony from a prominent member of

the Ardmore Bar as to Respondent's general good reputation, competence, and standing in the local legal community.

We cannot accept however, the PRT's recommendation. Respondent's lack of disclosure and misrepresentation to his clients calls for more than just a minimum suspension. The attorney-client relationship deserves primary consideration. An attorney's dealings with his clients should be guided by utmost candor and fairness.[25] We further find though that Complainant's suggested time of discipline is to severe in light of the mitigating evidence. Under the circumstances, we find a one year suspension and restitution more appropriate.

## ASSESSMENT OF COSTS TO RESPONDENT

Finally, pursuant to Rule 6.16 of the Rules Governing Disciplinary Proceedings, Respondent is ordered to pay costs. Costs for the investigation, the record, and the disciplinary proceedings totaling $5,611.61 shall be paid by Respondent.[26]

## CONCLUSION

By clear and convincing evidence, we find Respondent has violated the provisions of the Code of Professional Responsibility as discussed above. IT IS THEREFORE ORDERED, ADJUDGED AND DECREED by this Court that Respondent is suspended from the practice of law in the State of Oklahoma for a period of one year from the date this opinion becomes final. Respondent is further ordered to pay Wakely $16,643.24 by way of restitution.[27] Reinstatement of

---

22. *State ex rel. Oklahoma Bar Ass'n v. Todd*, 833 P.2d 260, 267 (Okla.1992).

23. 770 P.2d at 899.

24. *See Todd*, 833 P.2d 260; *McMillian*, 770 P.2d 892.

25. *Warzyn*, 624 P.2d at 1073.

26. Rules Governing Disciplinary Proceedings, 5 O.S.1991, Ch. 1, App. 1–A, Rule 6.16:
   Where discipline results, the cost of the investigation, the record, and disciplinary proceedings shall be surcharged against the disciplined lawyer unless remitted in whole or in part by

the Supreme Court for good cause shown. Failure of the discipline lawyer to pay such costs within ninety (90) days after the Supreme Court's order becomes effective shall result in automatic suspension from the practice of law until further order of the Court.

27. This figure represents:

(1) The difference between 50% fee of Wakely's gross award of $52,159.80 ($26,079.90) and 40% fee of Wakely's net award ($52,159.80 – $4,818.15) (Wakely's share of litigation expenses) = $47,341.65 (net award) × 40% = $18,936.66); $26,079.90 – $18,936.66 = $7,143.24. (The PRT figure of $5,215.98 gave Respondent the

Respondent to the practice of law will be conditioned upon restitution being paid. Respondent, within 90 days from the date this opinion becomes final, shall pay the costs of this proceeding in the amount of $5,611.61.

HODGES, C.J., and SIMMS, OPALA and SUMMERS, JJ., concur.

KAUGER, J., concur in part; dissent in part.

ALMA WILSON and WATT, JJ., dissent.

HARGRAVE, J., disqualified.

benefit of a contingent fee on *gross* recovery whereas we are of the view his fee was limited to *net* recovery.)

(2) $7,143.24 overcharge + $9,500 (amount Respondent charged Wakely for Angela's waived fees) = $16,643.24.