2002 OK CIV APP 40

PEZOLD, RICHEY, CARUSO and BARKER, a Partnership of Professional Corporations, Plaintiffs/Appellees,

v.

CHEROKEE NATION INDUSTRIES, INC., an Oklahoma Corporation, Defendant/Appellant,

and

Cherokee Nation Enterprises, an Oklahoma Corporation, and Cherokee Nation, Defendants,

v.

Terry Barker, Third–Party Defendant/Appellee.

Cherokee Nation Industries, Inc., an Oklahoma Corporation, Plaintiff,

v.

Pezold, Richey, Caruso and Barker, a Partnership of Professional Corporations and Terry J. Barker, Defendant.

No. 93,856.

Court of Civil Appeals of Oklahoma, Division No. 3.

Jan. 26, 2001.

Certiorari Denied April 9, 2001.

Lloyd E. Cole, Jr., Ralph F. Keen, Jr., Stilwell, OK, and Lee I. Levinson, Tulsa, OK, For Appellant.

Joel L. Wohlgemuth, Thomas M. Ladner, Tulsa, OK, For Appellees.

## OPINION

Opinion by CAROL M. HANSEN, Chief Judge:

¶1 Defendant/Appellant, Cherokee Nation Industries, Inc. (CNI), seeks review of the trial court's order granting judgment against it in an attorney fee dispute with its former attorneys. We affirm because the trial court's order is not against the weight of the evidence or contrary to law.

¶2 Plaintiff/Appellee, Pezold, Richey, Caruso, & Barker (Firm), is a law firm in Tulsa. CNI hired Firm in January 1996 to represent it in a contract dispute with Stewart & Stevenson Industries, Inc. (S & S). S & S had a contract with the United States Army to build military vehicles. It subcontracted with CNI for the construction of a part of the vehicles called the wiring harness and dash harness assemblies. The subcontract called for S & S to place annual purchase orders over five years; however, it failed to place the annual orders and terminated the subcontract. On May 8, 1996, Firm filed a suit on CNI's behalf in the U.S. District Court for the Eastern District of Oklahoma, seeking damages against S & S for breach of contract.

¶3 The attorneys handling the matter for Firm were Third–Party Defendant/Appellee Terry Barker, a partner, and Piper Willhite, an associate attorney. Barker is the brother-in-law of then-Chief Joe Byrd of the Cherokee Nation. Cherokee Nation is the sole shareholder of CNI. At the beginning of the litigation, Meredith Frailey, an attorney, was the interim chief executive officer (CEO) of CNI. In August 1996, Hiram McFarland, previously the controller for CNI, became its

president and CEO, and Frailey became a vice-president.

¶ 4 Firm began its representation of CNI under an hourly-rate agreement, but the parties later entered a contingency fee agreement (CFA). The parties dispute who first proposed the CFA, when the CNI board of directors first discussed it, whether Barker misrepresented the likelihood of settlement, and whether the parties intended the CFA to excuse the hourly fees previously earned. On the morning of October 24, 1996, McFarland executed a CFA under which Firm would receive 37 1/2 percent of any recovery from S & S. That evening, at a court-ordered settlement conference before a federal magistrate, CNI and S & S reached a settlement agreement under which S & S would pay CNI $1.5 million dollars plus the cost of certain inventory CNI had purchased for the contract.

¶ 5 Following the settlement conference, CNI and S & S memorialized the settlement agreement. S & S executed the agreement on October 29, 1996, and McFarland executed it for CNI on November 11, 1996. The agreement provided for S & S to make the settlement check payable to Firm's trust account for the benefit of CNI. After S & S audited CNI's unused inventory, it paid the total sum of $1,866,137.12 to settle the case.

¶ 6 Firm withheld from the settlement proceeds its contingency fee of $699,801.42, $52,240.50 in costs including a finance charge of $6,097.50, $88,254.75 in unpaid hourly fees, $1,542.40 in other charges, and $59,163.53 for outstanding billings to other Cherokee Nation entities. On January 21, 1997, Firm distributed to CNI the sum of $972,067.75, which included the settlement balance of $965,134.52 as well as earned interest of $6,933.23. CNI retained counsel and objected to the distribution on January 23, 1997. The following day, Firm filed this action seeking a declaratory judgment. CNI counterclaimed for rescission of the CFA, breach of contract, and conversion. On February 14, 1997, Firm released to CNI under protest the $59,163.53 it had withheld for billings to other Cherokee Nation entities. That sum is the subject of other claims which the trial court bifurcated for separate trial.

¶ 7 After the trial court denied CNI's motion to amend its pleadings, CNI filed a separate action for fraud and misrepresentation against Firm and Barker in the District Court of Adair County. The two cases were consolidated in Tulsa County on February 17, 1999.

¶ 8 The parties tried the CFA issues before an advisory jury. Following CNI's case-in-chief, the trial court granted Barker's motion for a directed verdict on the claims against him as third-party defendant. After the close of all evidence, the trial court submitted the following special interrogatories to the advisory jury:

1. Do you find that CNI has proven by clear and convincing evidence that [Firm] made false representations, statements or omissions with the intent to induce CNI to enter into the Contingency Fee Agreement and that CNI relied on such false representations, statements or omissions in entering into the contract?

2. Do you find by the greater weight of the evidence that [Firm] and CNI reached an understanding or agreement that all of [Firm's] hourly attorney fees due and owing would be forgiven upon the signing of the Contingency Fee Agreement?

The advisory jury answered "No" to both questions.

¶ 9 The trial court agreed with the advisory jury, and after making extensive findings of fact and conclusions of law, entered judgment for Firm and Barker. It declared Firm was entitled to receive its hourly fees for legal services rendered to CNI through September 30, 1996. However, the trial court reduced the amount of such fees from $88,254.75 to $54,566.90 because Firm had increased its hourly billing rates without notifying CNI. The trial court denied CNI's counterclaims for fraud, breach of contract, undue influence, and rescission.

I

¶ 10 CNI first contends the trial court erred in failing to determine the $699,801.42 contingency fee retained by Firm was overreaching, excessive, unreasonable, and in violation of public policy. It argues (1) under

*State ex rel. Burk v. City of Oklahoma City,* 1979 OK 115, 598 P.2d 659, $699,801.42 for one-day's work is unreasonable, (2) allowing Firm to collect both hourly fees and a contingency fee for the same legal matter violates public policy and constitutes an unreasonable fee, (3) the CFA was unenforceable because Firm never executed it, (4) the CFA represents an improper and unreasonable measure of compensation because there was no realistic risk of non-recovery, and (5) the lack of new consideration for the CFA renders it unenforceable.

¶ 11 Attorneys and clients are free to contract between themselves for contingency fees. *State ex rel. Howard v. Okla. Corp. Com'n,* 1980 OK 96, 614 P.2d 45, 49. However, courts may refuse to enforce a contingency fee contract if the fee is excessive. *Abel v. Tisdale,* 1980 OK 161, 619 P.2d 608, 611. The upper limit for a contingency fee in Oklahoma is set by statute at 50 per cent of the net amount of the judgment recovered. 5 O.S.1991 § 7. The Oklahoma Supreme Court has applied this limitation in interpreting the meaning of "reasonable fee" and "clearly excessive" as used in DR 2-107(A) and (B), now covered by Rules 1.5(a) and 1.8(j)(2) of the Rules of Professional Conduct, 5 O.S.1991, Ch. 1, App. 3 A. *State ex rel. Oklahoma Bar Ass'n v. Watson,* 1994 OK 32, 897 P.2d 246, 251 n. 11, and 252. The only cases we find in which the Court has refused to enforce a bargained-for contingency fee within the statutory limit are those in which the contingency fee contract was "obtained by fraud, mistake, undue influence, or suppression of facts on the part of the attorney or in a manner contrary to public policy." *Oklahoma Turnpike Authority v. New Life Pentecostal Church of Jenks,* 1994 OK 9, 870 P.2d 762, 766 n. 17.

¶ 12 CNI does not assert Firm's total fee exceeded 50 percent of the net recovery. The issues raised in CNI's first proposition of error are fact issues relating to its rescission claim. Accordingly, our review of the reasonableness of the amount of the contingency fee necessarily involves consideration of the same fact issues that were tried in connection with CNI's rescission claim. Whether the trial court's fact findings are against the clear weight of the evidence is discussed in Part II below.

## II

¶ 13 CNI's second contention is the trial court erred in rejecting its claim the CFA was procured by fraud, misrepresentation and undue influence. CNI's claim is equitable in nature. *Southard v. MacDonald,* 1961 OK 72, 360 P.2d 940, 944. Therefore, we will examine the record and weigh the evidence, but will affirm the trial court's judgment unless it is against the clear weight of the evidence or contrary to law or established principles of equity. *Arine v. McAmis,* 1979 OK 162, 603 P.2d 1130, 1132. That the matter was tried before an advisory jury does not change the standard of review. *Butcher v. McGinn,* 1985 OK 58, 706 P.2d 878, 881.

¶ 14 CNI asserts Barker induced McFarland to enter the CFA by falsely representing to McFarland that Firm would forgive the hourly fees in exchange for the CFA and that S & S would not settle the case. McFarland testified the first board meeting of CNI he attended as CEO was on September 10, 1996. He said he and Dennis McLemore met with Barker and Willhite the morning of the board meeting to discuss the S & S litigation. McFarland testified they discussed possible witnesses but did not discuss fees. He said he first discussed a contingency fee with Barker on October 15, 1996 after Joe Jones told him Barker was willing to consider a contingency fee. McFarland testified Barker told him he would draft a contingency fee agreement for a 40 percent fee and fax it to McFarland. McFarland received the draft CFA that evening. On October 17, 1996, he took the draft CFA to another attorney, Ralph Keen, and asked Keen to make some changes on it, including reducing the percentage to 33 ⅓. McFarland signed the revised version on October 21, 1996 and faxed it back to Barker.

¶ 15 McFarland testified Willhite called him the following day and told him Barker would not accept less than 40 percent. McFarland talked to Barker the evening of October 23, 1996, and they agreed upon a contingency fee of 37 ½ percent. Barker

faxed an agreement to McFarland that evening. The following morning, McFarland signed it, dated it, and faxed it back to Barker.

¶ 16 McFarland testified, "My understanding all along was that any hourly fees would be waived. In fact, in a memo—one of the memos that was faxed to me it said that I needed to pay cost and expense. It did not even mention fees in—with one of the bills so ... My understanding all along [sic] the hourly fees would be waived ... if we signed a contingency fee agreement." When asked if there had been any discussion of the fees CNI had already paid in the case, McFarland responded, "I don't think specifically they [sic] was, but in my mind those are also included in the contingency fee agreement."

¶ 17 Other witnesses controverted McFarland's testimony. Joe Jones, a CNI director, testified McFarland asked the board at its September 10, 1996 meeting for approval to negotiate a contingency fee agreement with Barker. Jones said McFarland told the board he had met with Barker that day and Barker was in agreement to change from an hourly fee to a contingency fee. Jones said McFarland felt he could negotiate a good percentage rate on the fee.

¶ 18 Willhite testified she and Barker met with McFarland and McLemore the morning of September 10, 1996 because McFarland had recently become CEO of CNI and they needed to update him on the S & S litigation. She said they discussed trial strategy and the upcoming settlement conference. She said they discussed the case's strengths, including the existence of an S & S internal memo saying CNI had S & S "over the barrel," and weaknesses, including the problem that CNI had bid the five-year contract at a loss. Willhite testified that at the end of the meeting, McFarland asked Barker if Firm would consider continuing its representation of CNI on a contingency fee basis in this case. She said Barker responded he would have to consult with his partners.

¶ 19 Willhite testified she prepared the draft CFA and discussed with McFarland the changes he had Keen make to the agreement. She testified she told McFarland that Firm was unwilling to reduce the fee from 40 percent to 33 ⅓ percent because "this was a very complicated case" and "Barker felt that he was already providing CNI with a discount by waiving all of October's attorneys' fees and providing the contingency fee agreement with an effective date of October 1st, thereby ending all hourly billing as of September 30th." She said McFarland asked her if "Barker would consider doing 35 percent," and she responded, "I doubt it, but I will definitely present it to him." Soon thereafter, Barker and McFarland had a telephone conversation in which they agreed to a fee of 37 ½ percent.

¶ 20 Three days before the settlement conference, Barker sent McFarland a letter transmitting a draft authorization letter granting settlement authority to Frailey. The transmittal letter also stated,

> Needless to say, [S & S's] attorneys have always told us that they have no intent of making a settlement offer of any value to us. However, I am shocked that they gave us the low ball offer of $400,000.00 which is the exact same offer they gave Meredith a year to year and a half ago....
>
> ... [W]e have faith that the lawsuit is a good suit, and, more than ever, it appears that [S & S] intends to drag this matter out as long a[s] possible.
>
> ...
>
> Finally, I presume that Piper told you that [S & S] is only sending a vice president of materials to attend the Settlement Conference. As a result, I feel it would be appropriate to send Meredith to this conference and not you.

¶ 21 CNI submits the testimony of S & S's attorneys to establish the falsity of Barker's representations in the above-quoted letter. Gregory Jones was S & S's lead trial counsel. He agreed he became familiar with Judge Seay's "rocket docket" when CNI sued S & S in the Eastern District of Oklahoma. When asked if his client had instructed him to delay or drag this case out, Jones responded, "Well, let me just say this. We didn't have enough time to do any kind of a delay.... Notwithstanding what my client might have

instructed me, but we didn't—we were pressed for time." Jones said he had moved for more time, but received only a 60–day extension, which he thought was "rather short."

¶ 22 Jones testified he had generally talked with Barker about settlement in telephone conversations and at depositions in October. Jones said he was concerned CNI would not bring someone with settlement authority to the settlement conference, so he tried to impress on Barker he was bringing high level representatives, including the vice president of materials and the general counsel. Later he admitted he "probably equivocated a little bit" about whether the general counsel would be available. Jones agreed S & S had made no offer over $400,000 prior to the settlement conference, and said, "at no time prior to the 24th did CNI come off its demand" of $3.4 million. Jones described the settlement conference as follows:

> We met at 2:00 with the Magistrate Judge, . . . for an hour or so in which we talked generally about the case, . . . and then we broke up into separate caucuses, our party, the [S & S] party, going into a conference room and I believe the CNI group went either to the courtroom or to another room. And then the Magistrate Judge made several visits back and forth between the parties. At one point, which I remember being relatively early in the process, Judge Payne came . . . into our conference room and said, "Well, I don't think it's going to settle," and at that point asked the lawyers only to go into the courtroom to meet with our counterpart from Cherokee Nation.

> The Judge repeated his analysis that there wasn't going to be a settlement, and at that point I expressed my unhappiness and disappointment that there had not been any negotiations essentially at that point. . . . I remember expressing that as strongly as I could because, again, we had come with the idea of trying to negotiate a settlement.

> At that point Mr. Barker and I talked a little bit in general terms about, well, okay, let's try this again. We went back to our

separate caucuses and within a very, very short period of time the case was settled. Jones said the case settled at "probably 6:00 or 7:00" in the evening.

¶ 23 The trial court's finding "there was no agreement between the parties to forgive or waive payment by CNI of the unpaid hourly fees through September 30, 1996" is supported by this record. McFarland testified only to his "understanding" the hourly fees would be waived; he could not point to any conversation or negotiation in which he discussed the issue with Barker. To the contrary, he admitted there was no discussion regarding the fees CNI had already paid. Willhite's testimony establishes the parties agreed to waive only the hourly fees accrued in October 1996. Therefore, the trial court's finding is not against the weight of the evidence.

¶ 24 The trial court's findings Barker made no misrepresentations of fact and McFarland did not rely on Barker's October 21, 1996 letter in deciding to enter the CFA are likewise supported by this record. As the trial court noted, Barker's statements in the letter represented his professional judgment based on his knowledge at the time. The evidence established CNI had decided to enter into the CFA with Firm well before McFarland received Barker's letter. In addition, the parties had frankly discussed both the strengths and weaknesses of the case before they even began discussing changing to a contingency fee. On this record, the trial court's findings are not against the weight of the evidence.

¶ 25 Our affirmance of the trial court's fact findings disposes of the issues CNI raised in its first contention of error. The CFA was not obtained by fraud, mistake, undue influence, or suppression of facts on the part of the attorney or in a manner contrary to public policy. It met the requirements of the Code of Professional Responsibility. The *Burk* factors apply when attorney fees are set by the court; they do not apply when a contract establishes the amount of the fee. *Okla. Turnpike Auth. v. New Life Pentecostal Church*, 1994 OK 9, 870 P.2d 762, 765 n. 11. Under the agreement of the parties, CNI paid an hourly fee for services through

September 30, 1996, and a contingent fee for services thereafter. Such an arrangement does not result in a dual recovery for Firm. The legal services Firm performed after September 30, 1996 constituted the consideration for the CFA. Therefore, the trial court did not err in enforcing the CFA.

### III

¶ 26 CNI's third contention is the trial court erred in failing to acknowledge the fiduciary nature of the attorney-client relationship. It argues the trial court erred by disallowing expert testimony relating to the Rules of Professional Conduct; however, CNI provides no record citation showing "the substance of the [excluded] evidence was made known to the judge by offer or was apparent from the context within which questions were asked." 12 O.S.1991 § 2104(A)(2). Therefore, we may not disturb the trial court's evidentiary ruling.

¶ 27 CNI next argues it put on expert testimony showing the $699,801.42 fee is invalid, unenforceable, unreasonable, excessive, exorbitant, and unethical. As we discussed in Part II above, the trial court's fact findings are not against the weight of the evidence. CNI also argues Barker had a fiduciary obligation to delay any decision on shifting the fee arrangement until after the settlement conference. As we discussed in Part I above, attorneys and clients are free to contract between themselves for contingency fees provided the statutory limit is not exceeded, the attorney does not use fraud, mistake, undue influence, or suppression of facts to obtain the contract, and the contract is not contrary to public policy. In Part II above, we applied this law to the record in this case and found no error. CNI's third contention of error raises no new issues.

### IV

■ ¶ 28 CNI's fourth contention is the trial court erred in treating as law-of-the-case earlier rulings it made while acting through a different trial judge. These rulings were (1) the terms of the CFA are not ambiguous, (2) the CFA does not represent a forgiving of legal fees earned up to September 30, 1996, (3) the contract which resulted in the hourly billing of $88,254.75 is not ambiguous, and (4) CNI has presented no evidence to dispute the sum of $88,254.75, but there is a question of fact as to whether Firm dealt fairly and in good faith in regard to that sum. In its conclusions of law, the trial court set forth the prior rulings, but stated, "Although this court had ample legal basis to stand on the prior order, it nevertheless permitted CNI to present evidence at trial with respect to the issues of whether the hourly fees were forgiven and the amount of hourly fees to which [Firm] may be entitled." Based on the evidence CNI submitted disputing the sum due for hourly fees, the trial court reduced the hourly fee total from $88,254.75 to $54,566.90.

¶ 29 Contrary to the trial court's statement, CNI contends the trial court did apply the prior rulings to limit the evidence admitted at trial. However, it fails to challenge any specific evidentiary rulings and fails to show it made any offers of proof of excluded evidence as required by 12 O.S.1991 § 2104(A)(2). Therefore CNI failed to preserve any error arising from application of the prior rulings.

### V

■ ¶ 30 CNI's fifth contention is the trial court failed to shift the burden of proof to Firm of showing absolute good faith, lack of fraud, or undue influence in the procurement of attorney fees. CNI first argues the trial court improperly required it to prove fraud by clear and convincing evidence. It cites the holding of *Renegar v. Staples,* 1963 OK 207, 388 P.2d 867, 871–872, as transferring the burden of proof to the attorney to show lack of fraud and undue influence in an attorney-client transaction where the client alleges fraud and undue influence and proves "facts sufficient to show inadequacy of consideration." *Renegar,* in turn, cites *Owens v. Musselman,* 1942 OK 52, 190 Okla. 199, 121 P.2d 998, as authority for its holding. In applying *Owens v. Musselman,* the Oklahoma Supreme Court has stated,

However the burden of proof may have shifted as the case progressed, the plaintiff still had the final burden of proof to sus-

tain the allegations of the petition. We so held in our former opinion in *Owens v. Musselman*, supra [190 Okl. 199, 121 P.2d 998 ], where we said: 'Fraud and undue influence will not be presumed but ordinarily must be proven by clear, cogent and convincing testimony.'

*Watkins v. Musselman*, 1951 OK 387, 205 Okla. 514, 239 P.2d 418, 423. Therefore, CNI retained the final burden of proving fraud by clear and convincing evidence. The trial court did not err in requiring it to do so.

¶ 31 CNI next argues Barker could produce no contemporaneous time records to substantiate his 233 hours billed. CNI refers to no part of the trial record to support its assertion. Firm directs this Court's attention to its billing statements which were offered into evidence. The billing statements contain entries showing the work done, the attorney performing it, the date the work was done, and the amount of time spent performing the work. This exhibit constitutes detailed time records of the work performed.

## VI

¶ 32 CNI next contends the trial court committed several prejudicial errors of substantive law and procedure. It first argues the trial court erred in granting a directed verdict for Barker while denying a directed verdict as to Firm. Although this matter was tried before an advisory jury, the trial court had the final duty to determine questions of fact. *Gamel v. Hynds*, 69 Okla. 204, 171 P. 920, 921 (1918). In an equity action, the trial court should treat a motion for directed verdict as a motion for judgment and weigh all of the evidence presented. *Alonzo v. Alonzo*, 1996 OK CIV APP 48, 917 P.2d 1014, 1016–1017. The proper standard of review for the trial court's decision is whether it is against the clear weight of the evidence. *Snow v. Winn*, 1980 OK 27, 607 P.2d 678, 680. We have already performed this review in Part II above. The trial court did not err in granting the directed verdict for Barker.

¶ 33 CNI next argues the trial court erred in denying its demand for a jury

trial because an action for attorney fees is a law case which the trial court must submit to a jury. However, CNI's counterclaim to cancel the contingency fee agreement on the grounds it was secured by fraud is an equitable claim. *Southard v. MacDonald*, 1961 OK 72, 360 P.2d 940, 944. An equitable counterclaim converts a law action into an equitable one when it "ask[s] affirmative relief, which if granted, as it was, would cut out the foundations upon which the plaintiffs' right to recover depended, and therefore destroyed the plaintiffs' case." *Moschos v. Bayless*, 126 Okla. 25, 258 P. 263, 265 (1927), quoting *Lincoln Trust Co. v. Nathan*, 175 Mo. 32, 74 S.W. 1007 (1903). CNI's equitable counterclaim for rescission of the CFA would cut out the foundations of Firm's action to enforce the CFA. Therefore, the action is an equitable one and CNI had no right to a jury trial.

¶ 34 CNI next argues the trial court erred in finding it failed to comply with the Oklahoma statute governing rescission, 15 O.S. 1991 § 235, by not rescinding promptly upon learning of the fraud. Because we have already affirmed the trial court's decision finding no fraud, we need not consider this contention.

¶ 35 CNI next argues the trial court erred in disallowing its damages claim, requiring CNI to make an election of remedies and consolidate its claims into a rescission claim. At the second pre-trial conference, the trial court did state it would require an election between (1) repudiating the contract and demanding restitution, and (2) "treat[ing] the contract as subsisting and recovering damages of the fraud." However, at the close of the pre-trial conference, the trial court relented and stated it would allow "[t]he fraud claim [to] proceed to the jury if any of the damages being sought are separate and apart from the damages being sought in rescission." Therefore, the trial court did not require CNI to elect remedies.

¶ 36 CNI's last argument is a reiteration of its contention the judgment is against the clear weight of the evidence. We have already disposed of these issues in Parts I and II.

¶ 37 For the foregoing reasons, the judgment of the trial court is **AFFIRMED.**

¶ 38 GARRETT, J., and BUETTNER, P.J., concur.