883 So.2d 425 (2004)
In re Donald A. HOFFMAN.
No. 2003-B-2499.
Supreme Court of Louisiana.
September 9, 2004.
Rehearing Denied October 29, 2004.
*427 Charles B. Plattsmier, Baton Rouge, Shana Maurice Broussard, Shreveport, Counsel for Applicant.
Luther F. Cole, Long Law Firm, Jennifer J. Vosburg, Michael A. Paterson, Donald A. Hoffman, Counsel for Respondent.

ATTORNEY DISCIPLINARY PROCEEDINGS
PER CURIAM.
This disciplinary matter arises from one count of formal charges filed by the Office of Disciplinary Counsel ("ODC") against respondent, Donald A. Hoffman, an attorney licensed to practice law in Louisiana.

UNDERLYING FACTS
By last will and testament dated March 6, 1997, Milton Lorning bequeathed the sum of $10,000 each to his nephews, Jack J. Walker and Julian Walker, and the sum of $5,000 to his niece, Lillian Walker Wasserman. Mr. Lorning also bequeathed the sum of $2,000 each to Jack's daughter, Peggy Ann Walker Burns, and her two children. Mr. Lorning's second wife was the residual legatee of the rather considerable estate.
When Mr. Lorning died in July 1997, one month prior to his 99th birthday, some legatees, including Jack Walker, were disappointed to learn of the provisions of the will. In September 1997, Jack retained respondent to represent him in a contest of Mr. Lorning's will. However, the representatives of Mr. Lorning's succession were reluctant to negotiate with respondent on Jack's behalf unless respondent represented all of Mr. Lorning's surviving nieces and nephews. Respondent relayed this information to Jack and Peggy, who is an attorney practicing in Colorado. Thereafter, at Jack's insistence, Julian and Lillian reluctantly agreed to participate in the will contest.[1] By agreement with Jack, Julian and Lillian were not responsible for any legal fees or expenses incurred in connection with the will contest. Julian and Lillian also agreed that Jack would serve as respondent's primary contact with the Walker family, so as not to "duplicate things" and thereby "build up the legal fees."
In January 1998, Peggy drafted an affidavit authorizing respondent to negotiate and settle claims on behalf of Julian and Lillian; Jack, in turn, sent the affidavit to his brother and sister for their signatures.[2] *428 On January 23, 1998, Julian executed the one-paragraph affidavit, which states in its entirety as follows:
To whom it may concern:
I am represented by attorney Donald A. Hoffman with respect to a contest of Milton Lorning's will. Donald A. Hoffman is, furthermore, my representative with respect to any settlement negotiations which may take place with respect to such contest. Mr. Hoffman is authorized to accept, on my behalf, any amount in settlement of my claim as to the will of Milton Lorning, which is in excess of the amount of the legacy to me contained in such will. I will accept such settlement in full release of any further claims I may have against the will.
Lillian executed her affidavit on January 26, 1998. The notarized affidavits were then returned to respondent. Respondent did not communicate with Julian or Lillian either before or after he received the affidavits, with the exception of a letter confirming "that in connection with our law firm's representation of Mr. Jack Walker in the captioned matter, we are also authorized to represent you and all other Walker heirs and legatees."
The case proceeded to a mediation held on June 15, 1998. Julian and Lillian did not participate in the mediation, and though Jack was not personally present, his son and daughter were in attendance with respondent. During the mediation, the defendants offered to settle the claims of the Walker family against the Lorning succession for the total sum of $225,000. Peggy accepted the settlement offer on Jack's behalf. Respondent did not communicate with Julian or Lillian in any manner regarding the settlement. Rather, Jack called Julian and Lillian several days after the mediation and, without disclosing the total amount of the settlement, informed them that "I got you an extra $10,000."
On June 24, 1998, Julian spoke with respondent by telephone.[3] In response to Julian's inquiry, respondent informed him that the matter had settled for $225,000. Julian told respondent that "ten thousand dollars on a two hundred" was "not the way it was supposed to be." Respondent did not reply further, or otherwise seek to ascertain the nature and extent of Julian's objection, but simply suggested to Julian that "you'll have to talk to your brother."
On June 29, 1998, Jack sent respondent a letter setting forth his instructions concerning the distribution of the settlement funds. Respondent acknowledged Jack's distribution by return correspondence dated July 2, 1998. On July 22, 1998, Jack executed the settlement agreements and releases, with respondent signing the documents on behalf of Julian and Lillian. On July 30, 1998, in accordance with the instructions previously given by Jack, respondent disbursed $20,000 to Julian, $15,000 to Lillian, a total of $13,000 to Jack's children and grandchildren, and $159,500 to Jack.[4] Respondent did not communicate with Julian or Lillian prior to making these disbursements. The check to Julian was accompanied by a cover letter from respondent, stating:
I am pleased to enclose a check in the amount of $20,000 in accordance with the settlement in the captioned matter. Per the notarized authorization dated January 23, 1998, I accepted this amount on your behalf since it exceeds by $10,000 the amount of the legacy contained *429 in Article I.E. of the will of Milton Lorning dated March 6, 1997. In accordance with the conditions of the mediation, the terms of the Settlement Agreement are strictly confidential.
The cover letter accompanying Lillian's settlement check was substantially identical to Julian's letter, with the exception of the settlement amount and the date of the notarized authorization. Neither Julian nor Lillian received a copy of the executed settlement agreements and releases from respondent.
In 1999, Julian and Lillian filed a civil suit against Jack in Florida, contesting the unequal disbursement of the settlement funds.[5] The dispute between the siblings was never resolved, however, as Julian and Lillian dismissed the case upon Jack's death in March 2001.
Julian and Lillian also filed a complaint against respondent with the ODC, stating that they "were not consulted on [the] division of proceeds by Mr. Hoffman nor did we consent to it." In his response to the complaint, respondent asserted that his client "was Mr. Jack Walker, the individual who retained me, paid our law firm's fees, and authorized disbursement of the settlement funds." Respondent subsequently conceded that Julian and Lillian were his clients, but asserted they were so "only in accordance with the limited terms and conditions of our agreement, i.e., that I was authorized to accept, on his and her behalf, any amount in settlement in excess of the legacy in the Will of Milton Lorning." [emphasis in original]. Respondent further denied that he was required to obtain the consent of Julian and Lillian prior to the distribution of the settlement funds. To the contrary, respondent asserted that "at all times I was required to act solely on the instructions of Mr. Jack Walker, in consultation with his daughter, Attorney Peggy Burns, with respect to the disbursement of funds."

DISCIPLINARY PROCEEDINGS

Formal Charges
After investigation, the ODC filed one count of formal charges against respondent, alleging that his conduct in the Walker matter violated the following provisions of the Rules of Professional Conduct: Rules 1.4 (failure to communicate with a client), 1.8(g) (conflict of interest/aggregate settlement of the claims of two or more clients), and 8.4(a) (violation of the Rules of Professional Conduct). Respondent answered the formal charges and denied any misconduct. The matter then proceeded to a formal hearing on the merits.

Hearing Committee Recommendation
Considering the evidence presented, the hearing committee made the following factual findings relating to the conflict of interest issue:
1. An attorney-client relationship existed between respondent and Jack Walker, Julian Walker and Lillian Wasserman;
2. Respondent properly settled the matter on behalf of the Walker family;
3. Respondent participated in making an aggregate settlement of the claims of the Walker family;
4. Julian Walker and Lillian Wasserman did not consent to this aggregate settlement; and
5. Respondent's failure to obtain the consent of Julian Walker and Lillian *430 Wasserman constitutes negligent misconduct.
The committee made the following factual findings relating to the issue of respondent's failure to communicate with Julian and Lillian:
1. An attorney-client relationship existed between respondent and Jack Walker, Julian Walker and Lillian Wasserman;
2. Respondent failed to reasonably communicate with Julian Walker and Lillian Wasserman during the course of his representation on their behalf;
3. Respondent failed to provide Julian Walker and Lillian Wasserman with sufficient information to participate in decisions concerning the objectives of the representation; and
4. Respondent's failure to determine the method of communication preferred by Julian Walker and Lillian Wasserman constitutes negligent misconduct.
Based on these factual determinations, the committee concluded that respondent violated the Rules of Professional Conduct as charged in the formal charges.
By his actions, respondent negligently violated duties owed to his clients, and he caused actual injury to his clients. Respondent's failure to ensure that Julian and Lillian were kept informed about the status of the settlement negotiations and to ensure that Julian and Lillian had consented to the aggregate settlement resulted in the filing of a separate lawsuit by Julian and Lillian against their brother Jack. Julian and Lillian suffered financial loss by having to pay attorney's fees in this separate litigation. Finally, if in fact Julian and Lillian had an agreement with Jack to distribute the proceeds of the settlement equally, Julian and Lillian have been deprived of additional funds that they were rightfully entitled to receive.
In aggravation, the committee recognized respondent's experience in the practice of law (admitted 1969) and the vulnerability of the victims. In mitigation, the committee recognized the absence of a prior disciplinary record, the absence of a dishonest or selfish motive, respondent's cooperative attitude toward the proceedings, and his good character and reputation.
Turning to the issue of an appropriate sanction, the committee determined the baseline sanction for respondent's conduct is a reprimand. Standard 4.33 of the ABA's Standards for Imposing Lawyer Sanctions provides that a reprimand is generally appropriate when a lawyer is negligent in determining whether the representation of a client will adversely affect another client, and causes injury or potential injury to a client. Respondent failed to make an independent determination whether his representation of Julian and Lillian would adversely affect his representation of Jack, or vice versa. Furthermore, respondent failed to determine whether Julian's and Lillian's interests with regard to the distribution of the settlement proceeds were adverse to Jack's interests. As a result, Julian and Lillian suffered actual injury. Furthermore, Standard 4.43 provides for a reprimand when a lawyer is negligent and does not act with reasonable diligence in representing a client, and causes injury or potential injury to a client. Respondent owed an obligation to reasonably communicate with his clients. He failed to fulfill this obligation. Respondent's misconduct injured his clients by requiring them to seek other legal recourse to recover funds they were entitled to receive.
*431 Based on this reasoning, the committee recommended that respondent be publicly reprimanded.
Respondent filed an objection to the hearing committee's report and recommendation.

Disciplinary Board Recommendation
The disciplinary board found the record supported the hearing committee's finding that respondent took on the representation of Julian and Lillian, and that he participated in an aggregate settlement of his clients' claims. However, the board rejected as erroneous the committee's finding that Julian and Lillian did not consent to settlement in the aggregate. The board noted that while it may be true respondent did not directly consult with Julian and Lillian to obtain their consent to settle in the aggregate, he received their signed affidavits which clearly express the clients' intentions. The affidavits granted respondent limited authority to negotiate a settlement on their behalf and to accept any amount in excess of their legacies. It further stated that they would accept any such settlement. The board found that under Rule 1.2 (scope of the representation) of the Rules of Professional Conduct, a client has the ultimate authority to limit the purposes to be served by the representation. Because the scope and objectives of the representation were made clear by the affidavits and the clients expressed their consent to accept any amount in excess of their legacies, there was no need for respondent to further communicate with Julian and Lillian.
The board further noted that Julian and Lillian participated in the will contest primarily to enable Jack to pursue his claim (and bear all expenses). So long as Julian and Lillian did not receive less than they would have received under Mr. Lorning's will without a contest, they had no interest in the proceedings and to confirm this they expressly authorized respondent in advance to accept in settlement any amount in excess of the testamentary legacies in their behalf. This specific authorization defeats their later contention that they had any understanding that any settlement funds would be divided equally or that they had any interest in any active involvement in the matter.
Finally, the board noted that respondent had no reason whatever to question Jack's directive as to the division of the settlement, which satisfied entirely the authorization previously given by Julian and Lillian. There is no suggestion that respondent made any misrepresentations or otherwise deceived Julian or Lillian. The board concluded that perhaps respondent's "only `fault' was to achieve such a fine result."
In sum, the board determined
that respondent properly settled the matter in the aggregate and with the consent of his clients, Julian Walker and Lillian Walker Wasserman, who were always aware that their participation in any settlement would be limited subject only to being for amounts greater than their legacies. The board further finds that the clients limited the scope of the representation to serve their objectives which they expressed in their affidavits. Given the limited scope of the representation respondent's actions were in accord with the Rules of Professional Conduct and the board finds that he did not violate Rule 1.4 (communication) or Rule 1.8 (conflict) or Rule 8.4(a) of the Rules of Professional Conduct.
Based on this reasoning, the board recommended the formal charges against respondent be dismissed. One member of the board dissented.
The ODC sought review of the board's ruling in this court. We ordered the parties *432 to submit briefs addressing the issue of whether the record supports the disciplinary board's report. After reviewing the briefs filed by both parties, we docketed the matter for oral argument.

DISCUSSION
Bar disciplinary matters come within the original jurisdiction of this court. La. Const. art. V, § 5(B). Consequently, we act as triers of fact and conduct an independent review of the record to determine whether the alleged misconduct has been proven by clear and convincing evidence. In re: Quaid, 94-1316 (La.11/30/94), 646 So.2d 343; Louisiana State Bar Ass'n v. Boutall, 597 So.2d 444 (La.1992).
At the outset, we note that Rule 1.7(b) of the Rules of Professional Conduct permits an attorney to represent multiple clients in a single legal matter only if the lawyer reasonably believes that all of the clients will receive competent representation notwithstanding a potential conflict, and only if each client consents after full disclosure of "the implications of the common representation and the advantages and risks involved." These limitations permit a lawyer to represent multiple parties whose interests are generally aligned, assuming those parties consent after consultation. In the instant case, conceding for purposes of argument that the interests of Jack, Julian, and Lillian may have been aligned at the outset of respondent's representation, it is clear that respondent did not first obtain the informed consent of each of his clients to such representation. Specifically, respondent failed to discuss with his clients the nature of their potentially differing interests and the risks of the joint representation. Instead, he relied upon the daughter of one of his clients to draft an affidavit of representation, which in turn respondent's other clients signed without having the benefit of the advice of counsel. The affidavit signed by Julian and Lillian does not disclose "the implications of the common representation and the advantages and risks involved," nor does it constitute a voluntary and intelligent waiver by respondent's clients of the potential conflict. Under these circumstances, respondent did not comply with his obligations under Rule 1.7(b). More importantly, however, respondent's failure to appreciate the potential conflict between Jack and Julian and Lillian, and to guide his conduct accordingly, led directly to his violation of Rule 1.8(g) in the course of his settlement of the siblings' claims against the Succession of Milton Lorning.
Once the joint representation of Jack, Julian, and Lillian commenced in January 1998, respondent owed each of his clients an equal degree of loyalty, and he could not favor the interests of one client over another. Thereafter, upon undertaking to negotiate a settlement of the succession matter on his clients' behalf, respondent was obliged to comply with Rule 1.8(g), which at all times relevant herein provided:
A lawyer who represents two or more clients shall not participate in making an aggregate settlement of the claims of or against the clients, ... unless each client consents after consultation, including disclosure of the existence and nature of all the claims ... involved and of the participation of each person in the settlement. [emphasis added]
Without the aggregate settlement rule, a lawyer might be tempted "to sacrifice the interests of one client to gain an advantage for the other." Charles W. Wolfram, Modern Legal Ethics (1986), p. 493. Aggregate settlements of the claims of multiple clients are not per se impermissible, but *433 during the negotiation of the aggregate settlement, the lawyer must confer with all of his clients and fully disclose all details of the proposed settlement, including information about each client's claim and share of the proposed settlement. Rule 1.8(g) explicitly requires "consultation" before a client consents to an aggregate settlement. The lawyer must confer with all clients directly, rather than communicating with one client and expecting that client to confer with the other clients. Gail K. Gelb, Common Ethical Problems, 79 Mass. L.Rev. 167, 174-75 (1994). Unanimous informed consent by the lawyer's clients is required before an aggregate settlement may be finalized.[6] ABA/BNA Lawyers' Manual on Professional Conduct, 51:375 (1999). The requirement of informed consent cannot be avoided by obtaining client consent in advance to a future decision by the attorney or by a majority of the clients about the merits of an aggregate settlement. Id.
Applying these principles to the instant case, it is clear that respondent failed to make an adequate disclosure to his clients of relevant information concerning the settlement of the will contest. During the June 1998 mediation session, the defendants offered to settle the claims of the Walker family against the Lorning succession for the total sum of $225,000. Respondent did not communicate with all of his clients concerning this proposal; rather, after obtaining Jack's consent to the settlement, he accepted the defendants' proposal on behalf of all of his clients. Respondent never gave Julian or Lillian the opportunity to exercise their absolute right to control the settlement decision. See Rules 1.4 (a lawyer shall give a client sufficient information to participate intelligently in decisions concerning the objectives of the representation) and 1.8(k) (a lawyer shall not obtain a client's prospective consent to settle a claim without further authorization); see also Rule 1.2(a), pursuant to which a lawyer must abide by the client's decision whether to settle a matter.[7] Respondent can take no comfort that the affidavit of representation signed by Julian and Lillian absolved him of any responsibility in this regard, as the informed consent requirement cannot be avoided by obtaining client consent in advance to a future aggregate settlement proposal. Respondent then compounded his misconduct by proceeding to distribute the settlement proceeds in accordance with the wishes of only one of his clients, and over the expressed objection of another client. For purposes of this disciplinary proceeding, and respondent's obligations under the Rules of Professional Conduct, it is of no moment whether the Walker siblings had actually agreed to divide the settlement funds equally. Prior to accepting the settlement offer, respondent should *434 have resolved with all of his clients the issue of the allocation of the settlement proceeds.
These same issues have been confronted in other states, both in civil cases and in disciplinary matters arising out of aggregate settlements. One disciplinary matter is particularly noteworthy for its striking similarity to the instant case. In State ex rel. Oklahoma Bar Ass'n v. Watson, 897 P.2d 246 (Okla.1994), disciplinary proceedings were brought against a lawyer who received an aggregate settlement offer from the defendant in a personal injury and wrongful death case. Without consulting all of his clients, the lawyer accepted the settlement and determined on his own how to divide it among the decedent's estate, the decedent's second wife, and the decedent's minor daughter from his first marriage. The lawyer prepared no documents to present to the clients to account for the award and how it was allocated. In particular, the lawyer did not contact the decedent's wife before accepting the offer, and he never informed her of the total award, its distribution, and the participation of each person in the settlement. The Oklahoma Supreme Court found that the lawyer made an aggregate settlement without obtaining each client's consent or advising each client as to the proposed settlement and distribution, in violation of the professional rules. Rejecting the lawyer's argument that he was required to consult only with the personal representative of the decedent's estate, whom the lawyer asserted was the "true client," the court pointed out that the lawyer "had three clients in the action and owed to each the right of disclosure and consent in accepting and distributing the award."
Watson and the instant case demonstrate with perfect clarity that whenever an attorney attempts to jointly represent two or more individuals in a legal matter, the potential always exists for the lawyer to be pulled in different directions because of the differing interests of the clients. Such conflicts may arise at the beginning of the representation when the lawyer is making a determination whether to accept the clients, during the representation when new factual information is obtained that may put some or all of the clients at odds with each other, or at the time of settlement discussions. While conflict in a joint representation may not always be easy to identify or resolve, that difficulty is not implicated here. At a minimum, respondent should have obtained the informed consent of his clients  Jack, Julian, and Lillian  to the disbursement of the aggregate settlement that benefited all of them. Full disclosure and consent are required in handling aggregate settlements, and respondent failed at both.
Having found professional misconduct, we conclude the disciplinary board erred in dismissing the charges against respondent. We now turn to a discussion of the appropriate sanction for respondent's misconduct.
The purpose of disciplinary proceedings is not primarily to punish the lawyer, but rather to maintain the appropriate standards of professional conduct, to preserve the integrity of the legal profession and to deter other lawyers from engaging in violations of the standards of the profession. In re: Vaughan, 00-1892 (La.10/27/00), 772 So.2d 87; In re: Lain, 00-0148 (La.5/26/00), 760 So.2d 1152; Louisiana State Bar Ass'n v. Levy, 400 So.2d 1355 (La.1981). The discipline to be imposed depends upon the facts of each case and the seriousness of the offenses involved, considered in light of any aggravating and mitigating circumstances. In re: Redd, 95-1472 (La.9/15/95), 660 *435 So.2d 839; Louisiana State Bar Ass'n v. Whittington, 459 So.2d 520 (La.1984).
Based on the record before us, we conclude that respondent knew or should have known of the conflict of interest among his several clients, but that he did not fully disclose the possible effect of the multiple representation, resulting in serious actual harm to Julian and Lillian. Under such facts, the baseline sanction is a suspension from the practice of law.
As aggravating factors, we recognize the vulnerability of the victims, Julian and Lillian, and respondent's substantial experience in the practice of law. In mitigation, we recognize that respondent has no prior disciplinary record in more than thirty years of practice, and that he has demonstrated a cooperative attitude toward these proceedings. Evidence was also introduced as to respondent's good reputation in the legal community and in the community at large.
Considering all the facts of this case, we conclude the appropriate sanction for respondent's misconduct is a three-month suspension from the practice of law. However, in light of the mitigating factors, we will defer this suspension in its entirety, subject to the condition that any misconduct during a one-year period following the finality of this judgment may be grounds for making the deferred suspension executory, or imposing additional discipline, as appropriate.

DECREE
Upon review of the findings and recommendations of the hearing committee and disciplinary board, and considering the record, briefs, and oral argument, it is ordered that Donald A. Hoffman, Louisiana Bar Roll number 6894, be suspended from the practice of law for a period of three months. It is further ordered that the suspension shall be deferred in its entirety, subject to the condition that any misconduct by respondent during a one-year period following the date of finality of this court's judgment may be grounds for making the deferred suspension executory, or imposing additional discipline, as appropriate. All costs and expenses in the matter are assessed against respondent in accordance with Supreme Court Rule XIX, § 10.1, with legal interest to commence thirty days from the date of finality of this court's judgment until paid.
WEIMER, J., concurs in part and assigns reasons.
KNOLL, J., concurs in part and dissents in part for reasons assigned by WEIMER, J.
VICTORY, J., dissents.
WEIMER, J., concurring in part and dissenting in part.
I agree with the majority opinion except I would impose as a sanction a public reprimand as recommended by the hearing committee. In thirty years of practice, the respondent has no prior disciplinary record, has been cooperative in the disciplinary proceedings, and his reputation is outstanding. His ethical lapse came in failing to appropriately segregate the settlement from the disbursement of the settlement proceeds and in failing to afford each of his three clients the same level of attention regarding division of proceeds after the settlement.
VICTORY, J., dissenting.
I respectfully dissent and would dismiss the charges as recommended by the Disciplinary Board.
NOTES
[1] Before Jack approached Julian and Lillian to request their participation, he had already obtained the concurrence of Peggy and her two children (one of whom was still a minor) to contest Mr. Lorning's will.
[2] Respondent reviewed the affidavit Peggy drafted before Jack sent it to Julian and Lillian for their signatures. Respondent suggested one minor revision to the draft affidavit, but otherwise made no changes.
[3] This was the first and only conversation respondent had with Julian. Respondent never spoke with Lillian.
[4] The remainder of the settlement, $17,500, was paid to respondent's law firm as attorney's fees.
[5] Julian and Lillian maintained that they had a verbal agreement with Jack to divide the settlement funds equally among the three siblings. For his part, Jack denied that such an agreement ever existed.
[6] Rule 1.8(g) was amended effective March 1, 2004 to require that each client give informed consent "in a writing signed by the client." Prior to the amendment, a lawyer was not required to obtain written consent to an aggregate settlement, although a prudent lawyer would have made it a practice to do so.
[7] Respondent has argued that he was permitted to limit the objectives of his representation of Julian and Lillian pursuant to Rule 1.2(b), which provides that a lawyer "may limit the objectives of the representation if the client consents after consultation." Specifically, he asserts that he was authorized to settle the succession matter on behalf of Julian and Lillian so long as he obtained for them an amount in excess of their legacies in Mr. Lorning's will. Even assuming that Julian and Lillian could grant respondent such a limited representation, see Rules 1.8(g) and 1.8(k), it is clear that they did not give their informed consent to the representation after "consultation" with respondent. Respondent has conceded that he never spoke with Julian or Lillian prior to the time they executed their affidavits of representation.