898 A.2d 512

THE TAX AUTHORITY, INC., PLAINTIFF–RESPONDENT, AND LEMAIRE–MCCUMSEY GROUP, INC.; INTEGRITY ACCOUNTING SERVICES, INC.; TAX PROS II, INC.; TAX PROS OF INDIANA, INC.; TAX PROS OF TENNESSEE, INC.; TAX PROS I, INC.; THE FAIRLINGTON GROUP, INC.; J/TAX ORLANDO, INC.; WING FINANCIAL SERVICES, LLC.; MID–ATLANTIC TAX SERVICE, INC.; SIRRAH, INC.; JACKSON HEWITT OF GREATER PITTSBURGH, INC.; THE SCHIESEL FAMILY, INC.; RED CENT EAST, INC.; RED CENT, INC.; NIGHT & DAY, INC.; SUPER TAX CORPORATION; THE TAX FIRM, L.L.C.; GALE YORK, INC.; MANDEEP SOBTI AND ANJEET SOBTI; 1040, INC.; CRESCENT CITY TAX SERVICE, INC.; ROSIE M. CONRAD AND MORRIS L. CONRAD; ROBERT FROST NICKERSON; TAX PREP, INC.; VALLEY CONSULTING, LLC; SPRAGGINS GROUP, INC.; TAX DOCTOR, INC.; JANET L. BUNCH; V.R. RAWLEY COMPANY, INC.; MAXIMUN DEDUCTIONS, INC.; PETRA ENTERPRISES, INC.; JOSEPH P. O'ROURKE; CRIMMEN & SEMLITSCH, INC.; THOMAS RYAN

D/B/A A&S COMPANY; VISALLI ENTERPRISES, LLC; NORTH-ERN OKLAHOMA TAX & BUSINESS SERVICE, LLC; TAX PRO-FESSIONALS OF AMERICA, INC.; THE WHITTINGTON COMPA-NIES, INC.; JT FINANCIAL SERVICES, LLC; EVELYN R. MATHERNE; BRIAN M. DESIDERIO; THOMAS E. WEBB; ALA-BAMA FAST TAX, INC.; IT MAKES CENTS, INC.; CHESTAX COMPANY; RONALD P. WEBER; TAX PARTNERS, LLC; JHL TAX SERVICE, INC.; RICHARD RICHARDS, TRUSTEE OF RICH-ARDS FAMILY TRUST; TECHNOSOFT, INC.; DAVID LEE HEN-RY; FASTAX, INC.; JUDY HOOKER; MICHAEL E. KREMPP; GUNWANT S. REKHI; BHUPINDAR S. REKHI; JENNIFER CARR; H&T TAX SERVICE, INC.; GORBA, INC.; WE TAX & FI-NANCIAL SERVICES, LLC; DAC TAX SERVICE, INC.; BAYSIDE TAX SERVICE, INC.; MICHAEL R. DAUGHERTY; JAMES L. FULLERTON AND JEAN E. FULLERTON; KTRAIN, INC.; CIN-BERT, INC.; TKA VENTURES, INC.; FASTAX SERVICES, INC.; COMPREHENSIVE BUSINESS ACCOUNTING, INC.; INDIVIDUAL TAXES, ETC., INC., CAROLINA TAX SERVICE, INC.; CRCNS, INC.; SOFAR, INC.; MONEY MATTERS, LLC; CK VENTURES, INC.; PELICANS III, INC.; BRITS, INC.; CENTAX, INC.; JOHN R. MCCLASKEY; TODD R. FORESTER AND THERESE A. JEAN; BNS ENTERPRISES, INC.; GST AND COMPANY, LLC.; AC-COUNTING TO YOU, INC.; CAROLYN KOEHLER; MOORE TAX SERVICE, INC.; J.H. DEVELOPER'S, INC.; G. SCOTT LEADER; IVY ENTERPRISES, INC.; U.FILE, LLC.; SSC HOLDING COMPA-NY; KE FARMER ENTERPRISES, INC.; MELINDA MEGAHEE D/B/A TAXMAX; E TAX SERVICE, INC.; METRO COMPUTAX SERVICES, INC.; INCOME TAX OFFICE OF JOHN J. POLTO-NOWICZ, INC.; J AND C TAX SERVICE, INC., GERALD BREU-NIG AND DIANE ROHRBACH D/B/A B–R TAX SERVICE; JUDY A. BENITSCHECK; MARAY, INC.; BUFFINGTON TAX SERVICE, INC.; IRVING R. MCMILLIAN; LEWIS & COMPANY, INC.; DON B. TAYLOR; TGW CORP.; METRO–EAST ACCOUNTING INC.; OL-SEN & THOMPSON TAX SERVICE; JFB FINANCIAL SERVICES; LINDSEY ENTERPRISES, INC.; WILLIAM HALLUM AND LINDA HALLUM; UPSTATE TAX SERVICE INC.; JORDAN ANDERSON, INC.; ROBERT D. WILLIAMS; VNE CORPORATION; WISCONSIN TAX SPECIALIST, INC.; NUZZO ENTERPRISES, INC.; ARKAY RESOURCES, INC.; JH BUCKEYE, INC.; IV TAX INC.; TAX PRO-FESSIONALS, INC.; DEBORAH A. RENFRO; BARBOUR ENTER-PRISES, INC.; ROBERT B. NUNEMACHER; T&C TAX SERVICES, INC.; ANKIT PATEL AND RAJULA PATEL; ACCOUNTING ASSO-CIATES, INC.; ELLE, INC.; ROBERT W. DUVALL; PHILLIP L. GRAHAM; BRATTAIN, INC.; CRAIG W. KOBYLASZ; TAXES UN-LIMITED, INC.; ASK TAX, INC.; IAI CORPORATION; LCB TAX

ASSOCIATES, INC.; PIERCE PRINCIPLE VENTURES, INC.; CAMA ENTERPRISES, INC.; SPEED FILING INC.; SUNCOAST FINANCIAL SOLUTIONS, INC.; FONTAINE & ASSOCIATES, INC.; CAROL BAUMAN AND KENNETH ALLEN; STELLA G. MCANALLY; YOLANDA BROWN; JAMES W. COLLINS; KHJH, LLC; B. GREGORY WHALEY; MARYLAND SAMCO, INC.; MAURIN FINANCIAL SERVICES, INC.; KAREN LANCE; SCOTT E. ENTERPRISES, INC.; BABZE GROUP, INC.; JOSEPH A. TYSON, JR.; AND CERL, LLC, PLAINTIFFS, v. JACKSON HEWITT, INC. A VIRGINIA CORPORATION, DEFENDANT–APPELLANT, AND PACIFIC CAPITAL BANK, N.A., A NATIONAL BANKING ASSOCIATION D/B/A SANTA BARBARA BANK & TRUST, DEFENDANT.

Argued January 18, 2006—Decided May 31, 2006.

*John F. Dienelt,* a member of the District of Columbia bar, argued the cause for appellant (*Pitney Hardin,* attorneys; *Dennis R. LaFiura,* on the briefs).

*Norman Shabel,* argued the cause for respondent (*Shabel & DeNittis,* attorneys; *Stephen P. DeNittis,* on the brief).

Justice WALLACE, JR. delivered the opinion of the Court.

The issue presented is whether our *Rule of Professional Conduct (RPC)* 1.8(g) prohibits an attorney who represents more than one client from entering into an aggregate settlement of the clients' claims without each client consenting to the settlement after its terms are known. In the present case, an attorney agreed to represent 154 individual franchisee-plaintiffs in their

claims against franchisor-defendant Jackson Hewitt, Inc.[1] Each plaintiff entered into an identical retainer agreement that provided for settlement of the matter if a weighted majority of plaintiffs approved the settlement. A Steering Committee of four plaintiffs was established to represent the interests of all 154 individual plaintiffs. After the Steering Committee negotiated a settlement in principle, a weighted majority of plaintiffs approved it, but eighteen others did not. Defendant sought to enforce the settlement against all plaintiffs, and the motion court granted that application. The Appellate Division held that the fee agreement violated *RPC* 1.8(g) because it required advance consent to abide by the majority's decision and reversed. *Tax Auth., Inc. v. Jackson Hewitt, Inc.*, 377 *N.J.Super.* 493, 496, 873 *A.*2d 616 (2005). We hold that *RPC* 1.8(g) forbids an attorney from obtaining advance consent from his clients to abide by the majority's decision about the merits of an aggregate settlement. However, for the reasons expressed in section IV of this opinion, we apply this decision prospectively. We reverse and remand.

## I.

Defendant Jackson Hewitt is a nationwide tax preparation service with its principal place of business in Parsippany, New Jersey. It has franchises throughout the United States. Plaintiff The Tax Authority, Inc. is a franchisee of Jackson Hewitt with its principal place of business in Maple Shade, New Jersey.

As part of their business operation, franchisees make Refund Anticipation Loans (RAL) to individual taxpayers in anticipation of the taxpayers receiving refunds from the Internal Revenue Service. The loans are repaid when the refunds are received. Prior to the 2000 tax season, Jackson Hewitt distributed monetary rebates called "Performance Incentive Rebates" arising out of

---

[1] Although Pacific Capital Bank, N.A. is a named defendant, its involvement is not at issue in this appeal. All references to defendant refer solely to Jackson Hewitt.

those loans to its eligible franchisees. Beginning in the 2000 tax season, Jackson Hewitt discontinued issuing those rebates.

The individual franchisees believed that Jackson Hewitt breached the franchise agreement by failing to issue rebates. Because the franchise agreement prohibited the franchisees from filing a class action lawsuit against Jackson Hewitt or its affiliates, the franchisees collectively retained attorney Eric H. Karp (Karp) of Witmer, Karp, Warner & Thuotte LLP in Boston to represent the group in a mass lawsuit. As part of that representation, each of the 154 plaintiffs entered into an identical attorney-client retainer agreement with Karp. Plaintiffs agreed that the matter would be pursued on a collective basis with fees being shared by each plaintiff on a per-RAL basis. Each retainer agreement provided that

> [t]he Client agrees that the Matter may be resolved by settlement as to any portion or all of the Matter upon a vote of a weighted majority of the Client and all of the Co-Plaintiffs. Each Plaintiff shall have one vote for each funded RAL for the 2002 Tax Season. The Client will be eligible to vote only if current in all payments required under this agreement.... A quorum for such vote shall be sixty percent (60%) of the votes eligible to be cast.

In addition to the majority-rules provision, the agreement provided that a four person Steering Committee would make the decisions regarding "all strategic and similar procedural matters other than the decision to settle the matter." The members of the Steering Committee were Robert Phillips, Robert Schiesel, George Alberici, and Kenneth Leese. Leese is the owner and president of the sole plaintiff herein, The Tax Authority.

The retainer agreement also specified that settlement proceeds would be apportioned according to each plaintiff's proportionate share of the RAL reserve. Specifically, the agreement provided that "[t]he Client will share in the net proceeds in the same ratio as its contribution to the RAL reserve for the 2002 Tax Season bears to the total contribution to the RAL reserve of all Co-Plaintiffs for the 2002 Tax Season." Formulas to calculate net proceeds, client contributions, and other necessary figures were

also included. Prior to signing the retainer agreement, each plaintiff had an opportunity to consult with outside counsel.

In July 2002, Robert Schiesel, a member of the Steering Committee, died. No other plaintiff was appointed to fill that position on the Steering Committee.

In August 2002, Karp filed a single complaint against Jackson Hewitt, naming each of the 154 franchisees as individual plaintiffs. Thereafter, the parties agreed to mediate their dispute. During mediation, Jackson Hewitt and the three member Steering Committee represented by Karp negotiated a settlement in principle that was reduced to a two-page document titled "JAMS Settlement Agreement" (JAMS Settlement). Jackson Hewitt's representatives and the three members of the Steering Committee all signed the JAMS Settlement, which was conditioned on approval by plaintiffs and by Jackson Hewitt's Board of Directors.

Karp had previously established a password-protected website to inform plaintiffs of developments in the case. In response to questions from various plaintiffs regarding the JAMS Settlement, on July 15, 2003, Karp posted an eleven-page document on the website that included a spreadsheet showing the calculation of each plaintiff's estimated net participation in the cash portion of the settlement. Karp later certified that Leese assisted one of Karp's associates "in creating and finalizing" the spreadsheet.

Leese helped to arrange a telephone conference call among most of the plaintiffs for the next day. During the conference call, which lasted approximately three hours, Karp attempted to answer any questions plaintiffs had about the JAMS Settlement. On July 17, 2003, and July 22, 2003, Karp submitted settlement ballots to plaintiffs and established August 1, 2003, as the deadline for voting.

At some point, Leese began to challenge Karp concerning the settlement. Leese believed that the other two members of the Steering Committee were meeting secretly with Karp. Leese then resigned from the Steering Committee on August 7, 2003, and

declined to participate in a conference call of the Steering Committee scheduled for that same day.

Ultimately, a weighted majority of plaintiffs approved the JAMS Settlement. Counsel prepared a more detailed, formal settlement agreement. On October 30, 2003, Karp posted to the website a copy of the formal settlement agreement and emailed a copy to each plaintiff. He requested that each plaintiff submit a signed duplicate copy of the agreement to him by November 12, 2003. That deadline was later extended to November 17, 2003. On November 21, 2003, Karp emailed every plaintiff and posted a notice to the website stating that any plaintiff who did not submit a response by December 1, 2003, would be presumed to have declined the settlement. That communication also indicated that Karp would ask the court for leave to withdraw as counsel for parties declining the agreement due to a conflict between those plaintiffs who had signed the settlement agreement and those who had not. On November 24, 2003, Karp reiterated the settlement deadline of December 1, 2003, and informed plaintiffs that on December 2, 2003, he would file a motion to withdraw as counsel for those plaintiffs who had not signed the agreement.

On December 2, 2003, Karp filed the promised motion, originally seeking relief from representation of twenty-six of the 154 plaintiffs. The following day, Jackson Hewitt filed a motion to enforce the settlement agreement against all plaintiffs.

Karp filed a certification and a supplemental certification in the matter. He certified that after the JAMS Settlement was signed, Leese had assisted his associate in creating and finalizing the spreadsheet that showed each plaintiff's estimated net share in the proceeds. Karp set forth his efforts to explain the settlement to plaintiffs and stated that as of December 17, 2003, he had received signed approval from all but twenty plaintiffs.

Three plaintiffs filed certifications in opposition to the settlement. Frederick Roberts claimed that Karp did not fully inform him of the "facts and circumstances of the proposed settlement" and that Karp failed to answer his questions regarding the

settlement agreement. Susan McCumsey certified that after Robert Schiesel died in July 2002, she did not have proper representation on the Steering Committee. Leese certified that he had been a member of the Steering Committee and that initially, the entire Steering Committee had regular discussions with Karp. However, after the JAMS Settlement was signed on July 1, 2003, Leese claimed that his involvement with Karp and the Steering Committee changed. Leese stated in part:

7. Once I began to challenge Mr. Karp, I learned that the remaining members of the steering committee were meeting with Mr. Karp without my knowledge.
8. As a result, I believe that the plaintiff body did not have full representation once the steering committee began meeting without my knowledge or participation.
9. When I learned of this development, I terminated my relationship with Mr. Karp and was no longer a member of the steering committee.

By the time the trial court heard argument on the motions, only eighteen plaintiffs had not yet signed the settlement agreement. Fourteen of those eighteen plaintiffs were represented by counsel and four were not. They asserted that Karp violated *RPC* 1.8(g) by obtaining advance consent to abide by any settlement approved by a majority of plaintiffs, and that therefore, they should not be bound by the settlement.

The trial court granted both Karp's motion to withdraw as counsel for the non-signing plaintiffs and Jackson Hewitt's motion to enforce the settlement agreement. The court ruled that the former *Disciplinary Rule* (*DR*) 5–106 of the American Bar Association's (ABA) *Model Code of Professional Responsibility* (1980) (*Model Code*), required disclosure of the total amount of the settlement prior to each plaintiff's approval, whereas the present *RPC* 1.8(g) did not. Consequently, the court concluded that the weighted majority provision in the retainer agreement did not violate *RPC* 1.8(g) and that invalidating the settlement agreement would be "imminently unfair" to plaintiffs who favored the settlement and to defendant.

The Tax Authority was the sole plaintiff to appeal. The Appellate Division reversed, holding that an attorney-client agreement with a weighted majority provision for settlement of litigation was

contrary to *RPC* 1.8(g) and unenforceable. *Tax Auth., supra,* 377 *N.J.Super.* at 496, 873 *A.*2d 616. In a thorough and well-reasoned opinion, Judge Weissbard found that "[t]he critical provision of the *RPC* is that the client consent to the final settlement." *Id.* at 506, 873 *A.*2d 616. While recognizing that some commentators advance good reasons for simultaneous representation and majority-rules provisions in retainer agreements, the Appellate Division observed that any change in the current interpretation of *RPC* 1.8(g) should come from the Supreme Court. *Id.* at 510, 873 *A.*2d 616.

We granted defendant's petition for certification. 185 *N.J.* 39, 878 *A.*2d 855 (2005). Defendant informed us at oral argument that except for The Tax Authority, the settlement has been executed and the appropriate monies disbursed to all other plaintiffs.

## II.

Defendant's main argument is that the Appellate Division incorrectly interpreted *RPC* 1.8(g) to preclude parties from agreeing to settle in any manner other than by unanimous consent. It asserts that "the Appellate Division relied almost exclusively on non-New Jersey authority applying *DR* 5–106, rather than authority interpreting *RPC* 1.8(g), notwithstanding the textual differences" between the two rules. Defendant also contends that the judgment below undermines New Jersey's strong public policy in favor of settling disputes. Alternatively, defendant urges that this is an issue of first impression, so if this Court affirms the judgment, the ruling should be applied prospectively only.

In contrast, The Tax Authority contends that the Appellate Division properly interpreted *RPC* 1.8(g). It maintains that a majority-rules mechanism to govern settlement creates an inherent conflict of interest between the parties and their counsel. The Tax Authority further argues that *RPC* 1.8(g) is necessary to safeguard the individual interests of each client, and that because the safeguards of court oversight for class actions are not present,

each client must individually consent to a settlement agreement after the terms of the settlement are made known.

### III.

Pursuant to the New Jersey Constitution, the Supreme Court has "jurisdiction over the admission to the practice of law and the discipline of persons admitted." *N.J. Const.* art. VI, § 2, ¶ 3. In discharging that responsibility, this Court has sought to maintain "public confidence in the judicial system." *In re LiVolsi,* 85 *N.J.* 576, 585, 428 *A.*2d 1268 (1981). "Given the critical importance of the constitutional power of this Court over the practice of law," *ibid.,* this Court has promulgated *Rules of Professional Conduct* that govern attorneys in New Jersey. Those rules "serve as a road map for the conduct of attorneys to guide them in their relationships with their clients, other attorneys, the courts, and the public." *In re Greenberg,* 155 *N.J.* 138, 152, 714 *A.*2d 243 (1998), *cert. denied,* 526 *U.S.* 1132, 119 *S.Ct.* 1807, 143 *L.Ed.*2d 1011 (1999).

The "[a]greements between attorneys and clients concerning the client-lawyer relationship generally are enforceable, provided the agreements satisfy both the general requirements for contracts and the special requirements of professional ethics." *Cohen v. Radio–Elecs. Officers Union,* 146 *N.J.* 140, 155, 679 *A.*2d 1188 (1996).

> When contracting for a fee, ... lawyers must satisfy their fiduciary obligations to the client. The lawyer must explain at the outset the basis and rate of the fee. In addition, the lawyer should advise the client of potential conflicts, the scope of representation, and the implications of the agreement. A retainer agreement may not provide for unreasonable fees or for the unreasonable waiver of the clients' rights.
>
> [*Id.* at 156, 679 *A.*2d 1188 (citation omitted).]

An agreement that violates the ethical rules governing the attorney-client relationship may be declared unenforceable. *Ibid.*

In 1984, New Jersey adopted the ABA's *Model Rules of Professional Conduct* (1983) (*Model Rules*). Pressler, *Current N.J. Court Rules,* note on *RPC* 1.8 (2006); *Jacob v. Norris, McLaugh-*

*lin & Marcus,* 128 *N.J.* 10, 19, 607 *A.*2d 142 (1992). At the time the conduct in the present case took place, *RPC* 1.8(g) provided that

> [a] lawyer who represents two or more clients shall not participate in making an aggregate settlement of the claims of or against the clients, or in a criminal case an aggregated agreement as to guilty or no contest pleas, unless each client consents after consultation, including disclosure of the existence and nature of all the claims or pleas involved and of the participation of each person in the settlement. [Pressler, *Current N.J. Court Rules, RPC* 1.8(g) (2003).]

The precursor to that rule was *DR* 5–106. It is necessary to review the evolution of *DR* 5–106 and the case law interpreting it to better understand the meaning of *RPC* 1.8(g).

In 1969, the American Bar Association adopted the *Disciplinary Rules* of the *Model Code,* and in 1971, New Jersey adopted the *Model Code. Jacob, supra,* 128 *N.J.* at 19, 607 *A.*2d 142. Under the *Model Code, DR* 5–106 governed the settlement of multi-party litigation and provided that

> [a] lawyer who represents two or more clients shall not make or participate in the making of an aggregate settlement of the claims of or against his clients, unless each client has consented to the settlement *after being advised of the existence and nature of all the claims involved in the proposed settlement, of the total amount of the settlement, and of the participation of each person in the settlement.*
>
> [*ABA/BNA Lawyers' Manual on Professional Conduct* 51:375–76 (1999) (emphasis added) (quoting *DR* 5–106).]

That rule is commonly referred to as the "aggregate settlement" rule. *See* Lynn A. Baker & Charles Silver, *The Aggregate Settlement Rule and Ideals of Client Service,* 41 *S. Tex. L.Rev.* 227, 234 (1999).

The seminal case interpreting *DR* 5–106 is *Hayes v. Eagle–Picher Industries, Inc.,* 513 *F.*2d 892 (10th Cir.1975). There, the eighteen plaintiffs retained a single lawyer to file an action against the defendant. *Id.* at 892. On the eve of trial, the parties reached a settlement agreement, which thirteen of the eighteen plaintiffs approved. *Id.* at 892–93. The following day, in open court, the trial court inquired whether any of the plaintiffs were opposed to the settlement. *Id.* at 893. After receiving no objections, the court entered a judgment of settlement. *Ibid.* Thereafter, two members of the plaintiff group claimed they did not hear the

court's question and challenged the settlement. *Ibid.* After initially vacating the judgment, the trial court reconsidered and reinstated the settlement. *Ibid.*

The Tenth Circuit reversed, finding that an agreement that authorized settlement of a case "contrary to the wishes of the client and without his approving the terms of the settlement is opposed to the basic fundamentals of the attorney-client relationship." *Id.* at 894–95. The court was troubled by the majority-rules provision, stating that

[i]t is difficult to see how this could be binding on non-consenting plaintiffs as of the time of the proposed settlement and in the light of the terms agreed on. In other words, it would seem that plaintiffs would have the right to agree or refuse to agree *once the terms of the settlement were made known to them.*
[*Id.* at 894 (emphasis added).]

The court also found that the agreement posed an ethical problem for attorneys under *DR* 5–106 of the *Kansas Code of Ethics.* *Ibid.* In the court's view, that rule "requires the attorney to refrain from participating in a settlement on behalf of two or more clients unless each of them consents to it." *Ibid.* The court reasoned that "it was untenable for the lawyer to seek to represent both the clients who favored the settlement and those who opposed it." *Ibid.* As a result, the court concluded that "in a non-class action case such as the present one," an arrangement that allows a majority to control the rights of the minority "is violative of the basic tenets of the attorney-client relationship in that it delegates to the attorney powers which allow him to act not only contrary to the wishes of his client, but to act in a manner disloyal to his client and to his client's interests." *Id.* at 894–95.

More than ten years later, the Appellate Court of Illinois reached a similar result. In *Knisley v. City of Jacksonville,* 147 *Ill.App.*3d 116, 100 *Ill.Dec.* 705, 497 *N.E.*2d 883 (1986), *appeal denied,* 113 *Ill.*2d 575, 106 *Ill.Dec.* 47, 505 *N.E.*2d 353 (1987), also decided under *DR* 5–106, the court invalidated a settlement agreement that had been approved by a majority of the plaintiffs. There, the sixty-one plaintiffs sought to enjoin the City of Jacksonville from issuing certain building permits. *Id.* at 884. After

the plaintiffs' attorney entered into negotiations with the defendants, the attorney called a meeting of the plaintiffs to present a proposed settlement. *Id.* at 885. The attorney testified that as a result of that meeting, he believed that he had authority to settle. *Ibid.* When the defendants rejected the attorney's first settlement offer, a second settlement agreement was drafted. *Ibid.* Thereafter, the attorney contacted a majority of the plaintiffs; a majority agreed to the settlement. *Ibid.* After the attorney drafted documents to execute the settlement, one of the plaintiffs called the attorney to indicate her dissatisfaction with the settlement. *Ibid.* The attorney then held a second meeting with the plaintiffs, in which a "controversy arose among the plaintiffs as to whether the case should be settled." *Ibid.* As a result of that meeting, the attorney sought to withdraw as the plaintiffs' counsel. *Ibid.* Subsequently, the defendants filed a petition to enforce the settlement, and the trial court granted the petition. *Id.* at 885–86.

The appellate court reversed the trial court's enforcement of the settlement against those plaintiffs who opposed the settlement on appeal. *Id.* at 888. The court, however, affirmed the judgment for the plaintiffs who either approved the settlement or did not participate in the appeal. *Ibid.* In reaching its conclusion, the court first found that the record was "adequate to indicate that the plaintiffs never consented to be bound by the majority." *Id.* at 886. Second, the court concluded that enforcing the settlement against the dissenting plaintiffs would be "completely at odds" with *DR* 5-106, observing that *Hayes* was "remarkabl[y] similar[ ]" to the instant case." *Id.* at 886–87.

The court then discussed the "sharp distinction" between class action lawsuits and simple joinder actions. *Id.* at 887. The court noted that unlike class action lawsuits, which require a court to determine the reasonableness of a settlement, "[i]n a joinder action there is no judicial review of the settlement and a party should not be bound unless he has specifically agreed to it." *Id.* at 887–88. The court found that "[f]undamental fairness is violated when a settlement is allowed to bind parties who object and no

safeguards have been added to protect their interests." *Id.* at 888.

In 1977, the ABA undertook a review of the *Model Code* and established the Commission on Evaluation of Professional Standards, which "proposed substantial revisions in the form of ABA *Model Rules* that were adopted by the [ABA's] House of Delegates in final version on August 2, 1983." *In re Seelig,* 180 *N.J.* 234, 246, 850 *A.*2d 477 (2004). In July 1982, this Court requested that the New Jersey Supreme Court Committee on the Model Rules of Professional Conduct, chaired by United States District Court Judge Dickinson R. Debevoise (Debevoise Committee), consider the ABA *Model Rules. Ibid.* A year later, on June 24, 1983, the Debevoise Committee issued a report recommending the verbatim adoption of many of the ABA *Model Rules,* including *RPC* 1.8(g). *See Report of the New Jersey Supreme Court Committee on the Model Rules of Professional Conduct, N.J.L.J.,* July 28, 1983, at 1–2. In discussing that rule, the Debevoise Committee stated that *"Model Rule* 1.8(g) as amended in February 1983 is substantially the same as *DR* 5–106." *Id.* at 6. Thereafter, on July 12, 1984, this Court adopted many of the Debevoise Committee's recommendations, including the adoption of *RPC* 1.8(g)[2] in place of *DR* 5–106. Kevin H. Michels, *New Jersey Attorney Ethics: The Law of New Jersey Lawyering* 3 (2006).

---

[2] *RPC* 1.8(g) was modified effective January 1, 2004, to include the term "informed consent." As modified, the rule provides:

> A lawyer who represents two or more clients shall not participate in making an aggregate settlement of the claims of or against the clients ... unless each client gives informed consent after a consultation that shall include disclosure of the existence and nature of all the claims ... and of the participation of each person in the settlement.
>
> [Pressler, *Current N.J. Court Rules, RPC* 1.8(g) (2006).]

"Informed consent" is defined as "the agreement by a person to a proposed course of conduct after the lawyer has communicated adequate information and explanation about the material risks of and reasonably available alternatives to the proposed course of conduct." Pressler, *Current N.J. Court Rules, RPC* 1.0(e) (2006).

Recently, the Louisiana Supreme Court reached the same result under *RPC* 1.8(g) as had *Hayes* under *DR* 5–106. *In re Hoffman,* 883 *So.*2d 425, 433–34 (2004). In *Hoffman,* the six plaintiffs retained a single attorney to contest a will. *Id.* at 427. The plaintiffs agreed that one plaintiff would serve as the attorney's primary contact with all six plaintiffs. *Ibid.* Two of the plaintiffs signed an affidavit authorizing the attorney to negotiate and settle the case and accept "any amount in settlement . . . which is in excess of the amount" of that plaintiff's legacy under the will. *Id.* at 427–28. Thereafter, the attorney communicated with the lead plaintiff and accepted a settlement on behalf of all six plaintiffs in excess of their respective gifts under the will. *Id.* at 428. The two dissenting plaintiffs filed a complaint against the attorney with the Office of Disciplinary Counsel, claiming that they "were not consulted on [the] division of proceeds by [the attorney] nor did [they] consent to it." *Id.* at 429 (first alteration in original). The Louisiana Supreme Court held that *RPC* 1.8(g) had been violated and observed that

> [u]nanimous informed consent by the lawyer's clients is required before an aggregate settlement may be finalized. The requirement of informed consent cannot be avoided by obtaining client consent in advance to a future decision by the attorney or by a majority of the clients about the merits of an aggregate settlement.
>
> [*Id.* at 433 (citing *ABA/BNA Lawyers' Manual on Professional Conduct, supra,* at 51:375).]

Most scholars and commentators agree that a majority-rules provision is forbidden under *RPC* 1.8(g). *See, e.g.,* Howard M. Erichson, *A Typology of Aggregate Settlements,* 80 *Notre Dame L.Rev.* 1769, 1809 (2005) ("As currently understood, the rule does not allow clients to agree ex ante to be bound by majority rule on settlement offers, for example."); Nancy J. Moore, *The Case Against Changing the Aggregate Settlement Rule in Mass Tort Lawsuits,* 41 *S. Tex. L.Rev.* 149, 165 (1999) ("[T]he aggregate settlement rule forbids lawyers from entering settlement over the objection of any plaintiff, even when that plaintiff has agreed in advance to be bound by a vote of a majority or a supermajority."); Charles Silver & Lynn A. Baker, *Mass Lawsuits and the Aggre-*

*gate Settlement Rule,* 32 *Wake Forest L.Rev.* 733, 763 (1997) ("The Rule clearly contemplates that a lawyer will confer with his or her clients before closing a deal whose details have already been hammered out."); Marc Z. Edell & Phillip J. Duffy, *Ethical Pitfalls Confronting the Mass Tort Lawyer,* 166 *N.J. Lawyer* 32, 34 (Jan. 1995) ("[A]n agreement between plaintiffs' counsel and plaintiffs that the decision of whether to accept a settlement will be governed by a majority vote is impermissible since the plaintiffs have a right to accept or reject a known quantity.").

Obviously, in adopting a model rule promulgated by the ABA, we give great weight to our Committee's interpretation of the rule as well as to the ABA's interpretation of the rule. As noted, the Debovoise Committee's recommendation to adopt most of the ABA's *Model Rules* declared that *RPC* 1.8(g) was substantially the same as *DR* 5-106. Similarly, in discussing *RPC* 1.8(g), the *ABA/BNA Lawyers' Manual on Professional Conduct, supra,* at 51:375, makes it clear that a "lawyer may not seek advance consent or consent by way of a majority vote of the lawyer's multiple clients."

We are in accord with the position expressed by the Appellate Division that any textual differences between the former *DR* 5-106 and *RPC* 1.8(g) are without significance. The underpinning of both rules is that when a lawyer represents more than one client, each client has the right to accept or reject the settlement after the terms are known. Simply stated, *RPC* 1.8(g) imposes two requirements on lawyers representing multiple clients. The first is that the terms of the settlement must be disclosed to each client. The second is that after the terms of the settlement are known, each client must agree to the settlement.

We conclude that *RPC* 1.8(g) forbids an attorney from obtaining consent in advance from multiple clients that each will abide by a majority decision in respect of an aggregate settlement. Before a client may be bound by a settlement, he or she must have knowledge of the terms of the settlement and agree to them.

IV.

 Before the Appellate Division, defendant asserted that even if The Tax Authority was not bound by the majority vote, principles of equitable estoppel require the court to enforce the agreement because of the circumstances at the time the settlement was reached. The Appellate Division rejected that argument. *Tax Auth., supra,* 377 *N.J.Super.* at 511–14, 873 *A.*2d 616. Defendant does not make that same argument here but asserts that even if the majority-rules provision is invalid, this Court "should determine that such decisions on issues of first impression should only apply prospectively and that [The Tax Authority] remains bound by the settlement agreement."

 The general rule is that judicial decisions will be applied retroactively. *Velez v. City of Jersey City,* 180 *N.J.* 284, 296, 850 *A.*2d 1238 (2004). Even so, "[o]ur tradition is to confine a decision to prospective application when fairness and justice require." *Montells v. Haynes,* 133 *N.J.* 282, 297, 627 *A.*2d 654 (1993). We emphasized in *Montells* that prospective application is "appropriate when 'a court renders a first-instance or clarifying decision in a murky or uncertain area of the law . . . ,' or when a member of the public could reasonably have 'relied on a different conception of the state of the law.' " *Id.* at 298, 627 *A.*2d 654 (alteration in original) (citations omitted).

Such is the case here. This is the first opportunity for this Court to interpret *RPC* 1.8(g). Plaintiffs' counsel represented plaintiffs that were from many different states and successfully sought to have all plaintiffs agree in advance to be bound by a weighted majority. That effort was a plausible, although incorrect, interpretation of *RPC* 1.8(g). In addition, defendant was led to believe that plaintiffs had agreed among themselves to be bound by a weighted majority vote and relied on that in reaching the settlement. The Tax Authority's president, Leese, was a member of the Steering Committee, assisted in reaching the JAMS Settlement, and signed it. Subsequently, he was actively involved in negotiating the voting mechanism for plaintiffs' ap-

proval of the settlement but ultimately rejected the final settlement. All of the other plaintiffs have consented to the settlement, and defendant has satisfied its terms with all other plaintiffs.

On balance, we conclude that prospective application of our holding, and thus enforcement of the settlement against The Tax Authority, is the appropriate and equitable disposition of this matter.

## V.

Lastly, we recognize that some commentators have proposed that *RPC* 1.8(g) be changed to accommodate mass lawsuits. Professors Charles Silver and Lynn Baker suggest the rule should be amended to permit litigants to agree to abide by majority rule. Silver & Baker, *supra*, 32 *Wake Forest L.Rev.* at 769–70. They agree that "[b]ecause the stakes are so large and the issues so complex, settlement is both more urgent and more difficult in mass lawsuits than in other litigation, and the aggregate settlement rule is a complication that often gets in the way." *Id.* at 735–36. The complications they refer to include generating expense and delay, preventing defendants from obtaining finality, invading plaintiffs' privacy, and allowing a single claimant to hold out or block an entire settlement. *Id.* at 755–56.

In light of those and other concerns advanced in favor of permitting less than unanimous agreement in multi-plaintiff mass litigation, we refer this issue to the Commission on Ethics Reform for its review and recommendation to the Court.

## VI.

The judgment of the Appellate Division is reversed. The case is remanded to the trial court to reinstate the judgment to enforce the settlement.

*For reversal/remandment/reinstatement*—Chief Justice PORITZ, and Justices LONG, LaVECCHIA, ZAZZALI, ALBIN, WALLACE and RIVERA–SOTO—7.

*Opposed*—None.